[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 14-15804

_____

D.C. Docket No. 1:13-cr-20460-DMM-1

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

ANTONIO FARIAS,

Defendant-Appellant.

_____

Appeals from the United States District Court
for the Southern District of Florida

_____

(September 1, 2016)

Before MARCUS and FAY, Circuit Judges, and FRIEDMAN,* District Judge.

MARCUS, Circuit Judge:

_____

* Honorable Paul L. Friedman, United States District Judge for the District of Columbia, sitting by designation.

Over the course of about 10 months, Antonio Farias purchased more than 18 million unstamped Marlboro cigarettes from undercover agents of the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF"), at a significantly below-market price, and he arranged to have the cigarettes transported for sale on an Indian reservation in upstate New York.   The agents told Farias they had stolen the cigarettes from cargo trucks.  Farias was charged and convicted at trial of one count of conspiring, in violation of 18 U.S.C. § 371, to traffic in stolen goods, 18 U.S.C. § 2314, and to traffic in contraband cigarettes, 18 U.S.C. § 2342(a).  The district court sentenced Farias to 36 months in prison and ordered him to forfeit his proceeds from the offense, which the parties agreed were $331,426.  On appeal, Farias challenges:  (1) the denial of his motion to dismiss the indictment as untimely; (2) the denial of his motion to compel discovery or alternatively to dismiss the indictment based on claimed government misconduct; (3) the sufficiency of the evidence to sustain his conviction for conspiracy; (4) the district court's jury instructions; and (5) the court's authority to enter a forfeiture judgment at the sentencing hearing, where it had failed to enter a preliminary forfeiture order as soon as practicable after the verdict, as required under Fed. R. Crim. P. 32.2. After careful review, and having the benefit of oral argument, we affirm.

I.

In 2005, special agents of the ATF began investigating Farias for unlawfully trafficking in cigarettes in Miami-Dade County, Florida, based on a tip they had received from a confidential informant.  On June 20, 2006, a second confidential informant working with the special agents sold Farias more than one million unstamped Marlboro cigarettes.[1]  After that transaction, ATF placed the investigation on hold for about a year because the second confidential informant was serving a federal prison sentence.  Thereafter, on seven separate occasions between June 23, 2008, and April 2, 2009, undercover ATF special agents Peter Alles and Richard Checo, working with the first confidential informant, sold Farias a total of more than 18 million unstamped Marlboro cigarettes.  The agents sold Farias the cigarettes at a price per carton of only $19.50 -- significantly below the going list price, which was between $27 and $36 per carton.  Generally, the list price, which includes federal but not state taxes, is the lowest possible price at which a direct wholesaler can buy Marlboro cigarettes.  During the course of each of the seven cigarette transactions, the agents recorded their conversations with the defendant, Farias.

---

[1] A government witness explained at trial that Marlboro manufactures cigarettes in North Carolina, South Carolina, and Virginia, and the company pays a federal excise tax on all of its cigarettes before they leave the company's plants.  All of the states, including the State of Florida, impose their own separate excise tax, which is generally assessed when the cigarettes arrive in that state.  Payment of the state tax is evidenced by application of a tax stamp to the outer packaging of each pack of cigarettes.

After purchasing the cigarettes from the undercover agents, Farias immediately resold them to Stephen Valvo, who had arranged with his and Farias's mutual friend to haul the cigarettes to an Indian reservation in Salamanca, New York. Special Agent Alles explained at trial that, in order to evade detection by law-enforcement officers, cigarette traffickers often transport contraband cigarettes for sale on Indian reservations in New York and in other northeastern states. Farias initially sold Valvo the cigarettes at a price per carton of $21.95, but later increased the price to $24.95.

On June 21, 2013, a federal grand jury sitting in the Southern District of Florida initially indicted Farias and Valvo on one count of conspiring to traffic in contraband cigarettes, in violation of 18 U.S.C. §§ 371[2] and 2342(a),[3] and seven substantive counts of trafficking in contraband cigarettes, in violation of 18 U.S.C. §§ 2342(a) and 2. The indictment specifically charged that the conspiracy ran from April 7, 2006, through April 2, 2009. Moreover, it alleged 15 overt acts as part of the conspiracy, including the June 20, 2006 transaction between Farias and

---

[2] Section 371 provides that "[i]f two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined under this title or imprisoned not more than five years, or both." 18 U.S.C. § 371.

[3] Section 2342(a) provides that "[i]t shall be unlawful for any person knowingly to ship, transport, receive, possess, sell, distribute, or purchase contraband cigarettes or contraband smokeless tobacco." 18 U.S.C. § 2342(a).

the second confidential informant, the 7 transactions that occurred between June 23, 2008, and April 2, 2009, and 7 wire transfers between Valvo and Farias during that time frame.[4]  The indictment was sealed until Farias was arrested on June 16, 2014.

---

[4] The indictment alleged the following 15 overt acts:

(1)    On or about June 20, 2006, ANTONIO FARIAS purchased approximately 1,500,000 purportedly stolen cigarettes bearing no evidence of payment of applicable state cigarette taxes to the State of Florida, using a cashier's check in the amount of $112,500.

(2)    On or about June 23, 2008 STEPHEN VALVO sent, through a company he controlled, a wire transfer to ANTONIO FARIAS in the amount of $42,144.

(3)    On or about June 23, 2008, ANTONIO FARIAS purchased approximately 384,000 purportedly stolen cigarettes bearing no evidence of payment of applicable state cigarette taxes to the State of Florida, using a cashier's check in the amount of $37,440.

(4)    On or about July 22, 2008, STEPHEN VALVO sent, through a company he controlled, a wire transfer to ANTONIO FARIAS in the amount of $84,288.

(5)    On or about July 24, 2008, ANTONIO FARIAS purchased approximately 768,000 purportedly stolen cigarettes bearing no evidence of payment of applicable state cigarette taxes to the State of Florida, using a cashier's check in the amount of $74,880.

(6)    On or about September 15, 2008, STEPHEN VALVO sent, through a company he controlled, two wire transfers to ANTONIO FARIAS totaling $250,864.

(7)    On or about September 15, 2008, ANTONIO FARIAS purchased approximately 2,304,000 purportedly stolen cigarettes bearing no evidence of payment of applicable state cigarette taxes to the State of Florida, using two cashier's checks totaling $224,640.

(8)    On or about September 26, 2008, STEPHEN VALVO sent, through a company he controlled, a wire transfer to ANTONIO FARIAS in the amount of $252,864.

5

On July 17, 2014, the federal grand jury returned a superseding indictment, which again charged both Farias and Valvo with conspiring to violate 18 U.S.C. § 371. The superseding indictment alleged that the conspiracy, again, included trafficking in contraband cigarettes, in violation of § 2342(a), and that it also involved trafficking in stolen goods, in violation of 18 U.S.C. § 2314.[5] Notably,

(9)     On or about September 30, 2008, ANTONIO FARIAS purchased approximately 2,304,000 purportedly stolen cigarettes bearing no evidence of payment of applicable state cigarette taxes to the State of Florida, using a cashier's check in the amount of $224,640.

(10)    On or about October 24, 2008, STEPHEN VALVO sent, through a company he controlled, two wire transfers to ANTONIO FARIAS totaling $284,472.

(11)    On or about October 27, 2008, ANTONIO FARIAS purchased approximately 2,592,000 purportedly stolen cigarettes bearing no evidence of payment of applicable state cigarette taxes to the State of Florida, using two cashier's checks totaling $252,720.

(12)    On or about November 12, 2008, STEPHEN VALVO sent, through a company he controlled, a wire transfer to ANTONIO FARIAS in the amount of $210,720.

(13)    On or about November 13, 2008, STEPHEN VALVO sent, through a company he controlled, a wire transfer to ANTONIO FARIAS in the amount of $168,577.

(14)    On or about November 13, 2008, ANTONIO FARIAS purchased approximately 3,456,000 purportedly stolen cigarettes bearing no evidence of payment of applicable state cigarette taxes to the State of Florida, using two cashier's checks totaling $336,900.

(15)    On or about April 2, 2009, ANTONIO FARIAS purchased approximately 6,852,000 purportedly stolen cigarettes bearing no evidence of payment of applicable state cigarette taxes to the State of Florida, using a wire transfer in the amount of $668,070.

[5] Section 2314 provides that "[w]hoever transports, transmits, or transfers in interstate or foreign commerce any goods, wares, merchandise, securities or money, of the value of $5,000 or

the superseding indictment dropped the seven substantive § 2342(a) counts against Farias and Valvo, and shortened the time span of the conspiracy to a period commencing on or about June 4, 2008, and ending on or about April 2, 2009. The superseding indictment re-alleged the same overt acts that originally had been alleged in the initial charge (overt acts numbers 2-15), except that it dropped the June 20, 2006 transaction between Farias and the second confidential informant (overt act number 1).

Farias moved the district court to dismiss the superseding indictment because it was allegedly untimely under the governing five-year statute of limitations found in 18 U.S.C. § 3282(a),[6] since it was filed more than five years after the last alleged overt act, which had occurred on April 2, 2009. In the alternative, the defendant claimed that the government had violated the Due Process Clause of the Fifth Amendment by waiting until June 21, 2013 to bring the initial charge. He claimed that both the superseding and original indictments should be dismissed as being untimely. The district court denied each argument, reasoning that, while the superseding indictment was indeed filed outside the five-

---

more, knowing the same to have been stolen, converted or taken by fraud . . . [s]hall be fined under this title or imprisoned not more than ten years, or both." 18 U.S.C. § 2314.

[6] The statute of limitations provides that "[e]xcept as otherwise expressly provided by law, no person shall be prosecuted, tried, or punished for any offense, not capital, unless the indictment is found or the information is instituted within five years next after such offense shall have been committed." 18 U.S.C. § 3282(a).

year statutory limitations period, it plainly related back to the original, timely indictment because no broadening of the charges occurred.  The district court also denied Farias's due-process claim because he failed to show either actual prejudice or that the delay was an intentional construction used by the government to obtain tactical advantage over him.  See United States v. Marion, 404 U.S. 307, 324 (1971).

Farias proceeded to trial.  On the morning trial commenced, he moved the court to compel the government to produce details of the ATF's investigation, including the agency's dealings with Phillip Morris and other cigarette companies. Alternatively, he urged the district court to dismiss the superseding indictment based on claimed outrageous government misconduct.  Again, the district court denied Farias's motions, characterizing the allegations that cigarette companies were financing ATF's enforcement activities as being "pretty speculative."

In its case-in-chief, the government played each of the agents' recorded conversations with Farias for the jury, and also provided clarifying testimony.  In the recordings, the undercover agents repeatedly indicated that they were dealing with stolen goods.  Thus, for example, Special Agent Checo told Farias prior to the June 23, 2008 transaction that the conspirators' cigarette supply was unpredictable because they could only get the product "[w]hen it falls" off the back of a truck. Checo explained that this terminology was designed and intended to convey that

the undercover agents had stolen the cigarettes from cargo trucks that were transporting the merchandise. Notably, Farias responded: "Of course . . . . I know how it works." An employee of Altria Group Distribution Company -- Marlboro and Phillip Morris's parent company -- testified that Phillip Morris maintains a consistent supply of Marlboro cigarettes, so that the product is always available for purchase through legitimate channels.

In another recording, made on October 31, 2008, Special Agent Alles told Farias that he wanted to change trucks and let everything "cool down a bit" before selling the cigarettes. Alles explained that he was speaking in code, telling Farias that "because the product is stolen, I have to move it . . . basically to avoid detection by law enforcement." Farias's response was: "Of course." In fact, Farias then told the undercover agent that he didn't want to spend "too much time" at the warehouse, where the sale would take place. Special Agent Alles explained that Farias wanted to minimize his time at the warehouse because he was concerned that customs agents might come to inspect the warehouse and ask to see documentation for the cigarettes. In still another recording, made on November 6, 2008, Farias said he wanted to break up larger transactions into smaller shipments, which would be less likely to attract law-enforcement attention.

Farias had also explained to Special Agent Checo, prior to the July 24, 2008 transaction, that they would have nothing to worry about once the cigarettes made

9

it onto the New York Indian reservation, where state and federal law-enforcement authorities couldn't investigate the cigarettes for sale. During that conversation, Farias specifically asked undercover agent Checo to confirm if the cigarettes he was purchasing were stolen. Checo responded, "You don't want to know the answer to that." Farias then said: "Yeah, because I'm afraid. I mean, so many cases. They're after that, you know."

Valvo, who had entered a plea and agreed to cooperate with the government and to testify against Farias, explained that he knew the cigarettes he bought from Farias had been stolen, and that they were unstamped. At the time, Valvo did not know what price Farias had paid for the cigarettes, but he knew the price Farias was offering him for the contraband was "too cheap" by about $1.50–$1.65 per carton. Valvo added that Farias also told him the cigarettes "[w]eren't on board," which he, too, took to mean that the cigarettes had been stolen.

Farias testified in his own defense. He flatly denied knowing that the cigarettes were stolen and maintained that he was not responsible for paying Florida cigarette taxes.

During the charging conference, defense counsel asked the district court to give a "buyer-seller" instruction, which the court denied.[7] The district court noted

---

[7] Defense counsel requested that the jury be instructed:

[A] mere buyer-seller relationship does not constitute proof of a conspiracy. A defendant who sells to another person merchandise while believing it to be illegal

10

that "there's some authority in the drug area [that] if there's an isolated buyer/seller relationship that that can't constitute a conspiracy," but there was also authority indicating the instruction was unnecessary. The court found that the instruction was unnecessary and not supported by the evidence.

The district court, however, used a special verdict form, which asked the jury to find whether Farias was guilty or not of the conspiracy charge, and if guilty, whether the object of the conspiracy was to traffic in stolen goods, or to traffic in contraband cigarettes, or both. The jury found Farias guilty and that he had conspired both to traffic in stolen goods and to traffic in contraband cigarettes.

At the sentencing hearing, the government moved ore tenus for a forfeiture judgment in the amount of $719,538.60, which was a market-value estimate of the cigarettes Farias had purchased from the undercover agents, minus the amounts he had paid the agents. Farias objected, arguing that, pursuant to Fed. R. Crim. P. 32.2, the government had waived forfeiture by waiting until the sentencing hearing, and the court lacked the authority to enter a forfeiture judgment at sentencing since it had failed to enter a preliminary forfeiture order as soon as practicable after the verdict had been rendered by the jury. Alternatively, Farias claimed that the court should look to his actual profit, and not to the market value

---

merchandise does not, merely by selling the merchandise, commit a violation of the federal conspiracy law . . . .

11

of the cigarettes, in determining the amount to be forfeited.  Defense counsel agreed that Farias's personal profit was $331,426.  The court agreed with the defense on that point, and, therefore, ordered him to forfeit that amount.

Farias timely filed this appeal, challenging both his conviction and the district court's forfeiture order.

## II.

Generally, we review the district court's denial of a motion to dismiss an indictment for abuse of discretion, but the interpretation and application of a statute of limitations is a legal question that we review de novo.  United States v. Rojas, 718 F.3d 1317, 1319 (11th Cir. 2013).  We also review the sufficiency of the evidence de novo, drawing all reasonable inferences and resolving all questions of credibility in favor of the government.  United States v. Hasson, 333 F.3d 1264, 1270 (11th Cir. 2003).  Under this standard, we are required to affirm the verdict "if a reasonable juror could conclude that the evidence establishes guilt beyond a reasonable doubt."  Id.

We review the legal correctness of a jury instruction de novo, but defer to the district court on questions of phrasing absent an abuse of discretion.  United States v. Prather, 205 F.3d 1265, 1270 (11th Cir. 2000).  We also review de novo whether the defense was entitled to a requested jury instruction.  See United States v. Calderon, 127 F.3d 1314, 1329 (11th Cir. 1997).  Finally, we review the district

court's legal conclusions regarding forfeiture de novo, but its factual findings only for clear error. United States v. Puche, 350 F.3d 1137, 1153 (11th Cir. 2003).

### A.

Farias first argues that the district court erred in denying his motion to dismiss the indictment as being untimely under 18 U.S.C. § 3282(a). We disagree. The conspiracy charge in the superseding indictment had a five-year statute of limitations. See 18 U.S.C. § 3282(a); id. § 371. Thus, to be timely, the superseding indictment had to be returned within five years of the last alleged overt act, which occurred on April 2, 2009. See United States v. Isaacson, 752 F.3d 1291, 1302 (11th Cir. 2014), cert. denied, 135 S. Ct. 990 (2015). The initial indictment was returned on July 21, 2013, which fell squarely within the five-year limitations period. Although the original indictment was sealed, "the government may properly request the sealing of an indictment for a period beyond the statute of limitations." United States v. Edwards, 777 F.2d 644, 647 (11th Cir. 1985).

The essential question, then, is whether the superseding indictment related back to the original indictment, which was timely. Our case law makes it abundantly clear that the filing of a timely indictment tolls the statute of limitations for purposes of a superseding or new indictment if the subsequent indictment does not "broaden or substantially amend the original charges." United States v. Italiano, 894 F.2d 1280, 1282 (11th Cir. 1990). Here, the superseding indictment

13

actually narrowed, rather than broadened, the original charges. For starters, the original indictment charged Farias with one conspiracy count and seven substantive offenses, whereas the superseding indictment charged him with only one conspiracy count, having dropped the seven § 2342(a) substantive counts. The superseding indictment also shortened the timeframe of the conspiracy; thus the superseding indictment charged a conspiracy that spanned only from June 4, 2008, through April 2, 2009, whereas the original indictment ran from April 7, 2006, through April 2, 2009. What's more, 14 of the 15 overt acts that had been alleged in the original indictment (overt acts numbers 2-15) were re-alleged in exactly the same form in the superseding indictment. The superseding indictment omitted the 15th overt act that originally had been alleged (overt act number 1), and added none that were new.

Farias maintains, nevertheless, that the conspiracy charge in the superseding indictment broadened the original conspiracy because it added as an object of the § 371 conspiracy trafficking in stolen goods, as well as trafficking in contraband cigarettes which was found in the original charge. We remain unpersuaded. This Court has explained that the central policy purpose underlying statutes of limitations is to provide fair notice to a defendant. Id. at 1283. "If the allegations and charges are substantially the same in the old and new indictments, the assumption is that the defendant has been placed on notice of the charges against

14

him." Id. Both the original and superseding indictments charged Farias with conspiracy, under the same federal statute, 18 U.S.C. § 371. And, while the superseding indictment added violation of an additional federal statute as an object of the conspiracy, both indictments alleged the very same "Object of the Conspiracy," which was for "the defendants and their co-conspirators to unlawfully enrich themselves by receiving, possessing, and purchasing contraband untaxed cigarettes in Florida, which they believed to be stolen." Thus, the original indictment sufficiently placed Farias on notice that the government was alleging that he had joined an unlawful conspiracy that involved cigarettes that were not only untaxed, but which he believed to be stolen. The district court did not err in denying his motion to dismiss the superseding indictment as being untimely under the applicable statute of limitations.

Nor did the district court err in denying his due-process challenge. In order to establish that the government's delay in bringing the indictment -- even if it had been filed in a statutorily timely manner -- violated his due process rights, Farias was required to establish both (1) that the delay actually prejudiced his defense, and (2) that it resulted from a deliberate design by the government to gain a tactical advantage over him. United States v. Knight, 562 F.3d 1314, 1325 (11th Cir. 2009). Farias's vague allegation, stated at the highest order of abstraction, that the passage of time made it more difficult for him to reconstitute

15

his records for the charged transactions failed to explain how he suffered any actual prejudice. And he made absolutely no showing that the pre-indictment delay was the product of deliberate design by the government to gain a tactical advantage over him. Contrary to his claim, Farias was not entitled to an evidentiary hearing on his due-process claim because he failed to set forth any specific allegations in support of it. Cf. Blalock v. United States, 844 F.2d 1546, 1551 (11th Cir. 1988) (noting that a defendant must establish a prima facie case of improper disclosure of grand-jury matters to obtain an evidentiary hearing on such a claim); United States v. Silien, 825 F.2d 320, 322 (11th Cir. 1987) (discussing similar standard for evidentiary hearing on selective-prosecution claim).

B.

Farias also argues that the district court erroneously denied his motion to compel discovery of the ATF's dealings with Phillip Morris, or in the alternative to dismiss the indictment, purportedly based on outrageous government misconduct. As we read this record, the district court properly denied these applications as well. In so far as Farias launches a challenge to the lawfulness of the sting operation conducted by special agents of the ATF, the Supreme Court and this Court have recognized the possibility that the nature and extent of the government's involvement in a criminal scheme may violate a defendant's due process rights, but only where the government's conduct "violates 'fundamental fairness, [and is]

16

shocking to the universal cause of justice.'"  Owen v. Wainwright, 806 F.2d 1519, 1521 (11th Cir. 1986) (quoting United States v. Russell, 411 U.S. 423, 432 (1973)).   Employing this standard, we have repeatedly rejected challenges to reverse-sting undercover investigations, whereby undercover officers have occasion to offer and sell contraband to suspected traffickers.  See United States v. Sanchez, 138 F.3d 1410, 1413 (11th Cir. 1998) (citing United States v. Savage, 701 F.2d 867, 869-70 (11th Cir. 1983); United States v. Gianni, 678 F.2d 956, 960 (11th Cir. 1982); and United States v. Nicoll, 664 F.2d 1308, 1314-15 (5th Cir. Unit B 1982), rev'd on other grounds by United States v. Henry, 749 F.2d 203, 206 & n.2 (5th Cir. 1984)).

The Supreme Court has also made it abundantly clear that "[t]he limitations of the Due Process Clause . . . come into play only when the Government activity in question violates some protected right of the Defendant."  Hampton v. United States, 425 U.S. 484, 490 (1976).  Here, the evidence established that Farias was perfectly willing to repeatedly engage in unlawful cigarette transactions involving huge sums of money, and indeed he raised no entrapment argument at all.  His allegations that the sting operation benefited the tobacco companies and harmed the public health by making cigarettes available at a below-market price are irrelevant, and in all events, do not establish any violation of his due process rights.

Farias says, however, that the tobacco companies' involvement in the investigation somehow denied him the right to a disinterested prosecutor. We remain unconvinced. In Young v. U.S. ex rel. Vuitton et Fils, S.A., the Supreme Court recognized a criminal defendant's right to be tried by a disinterested prosecutor. 481 U.S. 787, 810 (1987). But we've explained that, while Young forbids an interested party from controlling the defendant's prosecution, it does not categorically forbid an interested party from having any involvement in the case. United States v. Siegelman, 786 F.3d 1322, 1329 (11th Cir. 2015), cert. denied, 136 S. Ct. 798 (2016). In his motion to dismiss the indictment, Farias only alleged, and again only in the most general way, that the tobacco companies somehow benefit from ATF's efforts to impede or thwart unlawful distribution and sale of contraband cigarettes. The problem Farias has is that this claim in no way shows that the cigarette companies exercised any control over the conduct of the investigation or prosecution. The tobacco companies did not decide whether to proceed with an undercover investigation, or how or when to do so. Nor did the tobacco companies have any control over what, if anything, would be sold to Farias. Nor, finally, is there even the remotest suggestion that the tobacco companies somehow affected the timing or nature of the prosecution itself.

Farias was not entitled to discovery on his misconduct claim. Plainly, the government is obliged to disgorge evidence or information that would be favorable

18

to the defendant. See Brady v. Maryland, 373 U.S. 83, 87 (1963), and its progeny. In his motion to dismiss the indictment, however, Farias has again failed to show how the tobacco companies' claimed involvement in the sting operation was in any way relevant to establish his innocence or mitigate his punishment. We decline to consider an argument that he raised for the first time in his reply brief that evidence of some benefit conferred on Phillip Morris would have been relevant to impeach the testimony from a representative of Phillip Morris. See United States v. Evans, 473 F.3d 1115, 1120 (11th Cir. 2006) ("[a]rguments raised for the first time in a reply brief are not properly before a reviewing court" (quotation omitted)).

But, in any event, Farias cannot show that he was prejudiced by the government's failure to turn over any claimed information about any alleged benefits conferred on Phillip Morris. The jury learned through Special Agent Alles's testimony that Phillip Morris provided the Marlboro cigarettes used in the sting operation and that the government agreed to pay Phillip Morris for the cigarettes with the money it recovered from Farias. Thus defense counsel had the opportunity to -- and did -- cross-examine the Phillip Morris representative with this information, and the representative testified that he had no knowledge of Phillip Morris's cooperation with the ATF.

C.

Farias also challenges the sufficiency of the evidence to establish a conspiracy either to traffic in stolen goods or a conspiracy to traffic in contraband cigarettes.  In order to convict him, the government was only required to prove beyond a reasonable doubt that he conspired to do the one or the other.  See United States v. McKinley, 995 F.2d 1020, 1025 (11th Cir. 1993) ("[I]t has always been the law that where an indictment alleges a conspiracy to commit several offenses against the United States, the charge is sustained by adequate pleadings and proof of conspiracy to commit any one of the offenses." (quotations omitted)).  As we read the record, the government provided more than sufficient evidence to prove beyond a reasonable doubt that Farias knowingly conspired to traffic in stolen goods.

The elements necessary to establish a § 371 conspiracy are these:  (1) an agreement between the defendant and at least one other person to achieve an unlawful objective; (2) the defendant's knowing and voluntary participation in the agreement; and (3) an overt act by a conspirator in furtherance of the agreement. Hasson, 333 F.3d at 1270.  As for the trafficking in stolen goods object of the conspiracy, Farias challenges on appeal only the government's proof that he knew the stolen nature of the cigarettes. The government provided more than sufficient

20

evidence from which the jury could have inferred that Farias knew the stolen nature of the cigarettes he purchased from the undercover agents.

For starters, Valvo testified that, when Farias sold him the cigarettes, Farias told him they "weren't on board," which Valvo, among others, understood to mean the cigarettes were stolen. The evidence also established that the undercover agents told Farias on numerous occasions that the cigarettes they were selling him had been stolen, and Farias affirmed his understanding of this fact in various ways. Again, for example, undercover agent Checo and the confidential informant told Farias that their cigarette supply was unpredictable because they obtained the product "[w]hen it falls" -- meaning they stole the cigarettes from cargo trucks -- and Farias responded, "I know how it works." Agent Checo also asked Farias if the confidential informant told him how they had gotten the cigarettes, and Farias responded: "I don't want to know." On still another occasion, Farias specifically asked Checo if the cigarettes were stolen. Checo responded, "You don't want to know the answer to that," which he intended to mean that they were stolen. And, in later transactions, undercover agent Alles told Farias that, before he could buy the cigarettes, they had to "let everything cool down a bit," which Alles testified was a coded way of telling Farias the cigarettes were stolen.

What's more, the agents sold Farias the cigarettes at a substantial price disparity -- at a price per carton of $19.50, while the list price per carton during the

21

relevant time period was between $27 and $36 -- which would have given Farias substantial reason to believe that the undercover agents had not gotten the cigarettes from some legitimate source or channel. Finally, the jury was entitled to discredit Farias's testimony that he did not know the cigarettes had been stolen (which it plainly did), and to consider that testimony as substantive evidence of his guilt. See United States v. Jiminez, 564 F.3d 1280, 1285 (11th Cir. 2009).

Farias also contends that the evidence against him was insufficient because the government failed to prove that his knowledge of the stolen nature of the cigarettes was based on an official representation,[8] which he maintains was charged in the superseding indictment. In fact, the superseding indictment charged that Farias and Valvo conspired to "knowingly transport, transmit, and transfer in interstate and foreign commerce goods . . . having a value of $5,000 or more, knowing the same to have been stolen, converted, and taken by fraud within the meaning of Title 18, United States Code Section 21, in violation of Title 18, United States Code, Section [] 2314." There was no official representation in the charge itself. Farias claims, nonetheless, that the government constructively amended the superseding indictment by relying on evidence other than an official representation. We disagree.

---

[8] Section 21 defines an "official representation" as "any representation made by a Federal law enforcement officer (as defined in section 115) or by another person at the direction or with the approval of such an officer." 18 U.S.C. § 21(b).

A constructive amendment occurs when "the essential elements of the offense contained in the [grand jury] indictment are altered to broaden the possible bases for conviction beyond what is contained in the indictment." United States v. Augustin, 661 F.3d 1105, 1115-16 (11th Cir. 2011) (quotation omitted).  However, "Congress defines the elements of an offense, not the charging document." Id. at 1116 (quotation omitted).  "[A]s long as the crime and the elements of the offense that sustain the conviction are fully and clearly set out in the indictment, the right to a grand jury is not normally violated by the fact that the indictment alleges more crimes or other means of committing the same crime." Id. (quotation omitted).

The superseding indictment charged Farias with conspiring to violate 18 U.S.C. § 2314, which makes it a crime for anyone to "transport[], transmit[], or transfer[] in interstate or foreign commerce any goods . . . of the value of $5,000 or more, knowing the same to have been stolen, converted, or taken by fraud." 18 U.S.C. § 2314.  Section 2314 does not require that the defendant's knowledge be based on an official representation.  See id.  Section 21, which is referenced in the superseding indictment, provides that, whenever the defendant's knowledge of the stolen nature of goods is an element of a Title 18 offense, "such element may be established by proof that the defendant, after or as a result of an official representation as to the nature of the property, believed the property to be

23

embezzled, robbed, stolen, converted, taken, altered, counterfeited, falsely made, forged, or obliterated."  18 U.S.C. § 21(a) (emphasis added).  By using the word "may," § 21 permits the government to prove knowledge based on an official representation, but does not require the government to do so.  Thus, by referencing § 21, the superseding indictment did not make an official representation an element of the charged conspiracy, and the government was not required to prove an official representation to convict Farias.  See Augustin, 661 F.3d at 1116.[9]

Nor did the district court err by denying Farias's request for a buyer-seller relationship instruction.  We've said that, "[a]s long as there is some basis in the evidence and legal support, the jury should be instructed on a theory of the defense."  United States v. Zlatogur, 271 F.3d 1025, 1030 (11th Cir. 2001).  However, "[a] district court's refusal to give a requested instruction warrants reversal only if the requested instruction was correct, the charge actually given did not substantially address it, and the failure to give the instruction seriously impaired the defendant's ability to present an effective defense."  United States v. Jones, 933 F.2d 1541, 1544 (11th Cir. 1991).

The district court denied Farias's request for a buyer-seller instruction based, in part, on defense counsel's representation that Farias's primary theory of defense

---

[9] Because we conclude that the government was not required to prove an official representation to convict Farias, we need not decide whether its evidence supported a finding that the undercover special agents' representations to Farias regarding the stolen nature of the cigarettes qualified as "official representation[s]" within the meaning of 18 U.S.C. § 21(b).

24

was that he was a broker, rather than a buyer or seller.  While the evidence could be read in one way to show a buyer-seller relationship between Valvo and Farias, we still see no reversible error.  The general conspiracy instruction given by the district court more than adequately met Farias's request.  See United States v. Lively, 803 F.2d 1124, 1128-29 (11th Cir. 1986) (concluding buyer-seller relationship instruction was unnecessary where the court's general conspiracy charge covered the substance of that instruction).  The district court instructed the jury that it could convict Farias only if it found that:  "Two or more persons in some way agreed to try to accomplish a shared and unlawful plan," and Farias "knew the unlawful purpose of the plan and willfully joined in it."  The district court also instructed that the unlawful plan alleged in the conspiracy count was to traffic in stolen goods or to commit the crime of trafficking in stolen cigarettes. The court further instructed the jury that "simply being present at the scene of an event or merely associating with certain people and discussing common goals and interests doesn't establish proof of a conspiracy," and "[a] person who doesn't know about [the] conspiracy but who happens to act in a way that advances some purpose of one doesn't automatically become a conspirator."  Those instructions substantially addressed Farias's concern that the jury might convict him based solely on his buyer-seller relationship with Valvo.

25

Farias also challenges the jury's finding that he conspired, not just to traffic in stolen goods, but also to traffic in contraband cigarettes. Because we can discern no error in his conviction for conspiring to traffic in stolen goods, and the jury -- on a special verdict form -- specifically found that object had been proven beyond a reasonable doubt, we need not address whether any error occurred with regard to the object of trafficking in contraband cigarettes. See McKinley, 995 F.2d at 1025.

D.

Lastly, Farias argues that the district court erred by failing to enter a preliminary forfeiture order after the jury rendered its verdict and before the sentencing hearing. We agree that the district court erred, but conclude after carefully reviewing the record that the error was harmless.

Fed. R. Crim. P. 32.2 sets out three required steps in criminal forfeiture proceedings. First, the "court must not enter a judgment of forfeiture . . . unless the indictment or information contains notice to the defendant that the government will seek the forfeiture of property as part of any sentence in accordance with the applicable statute." Fed. R. Crim. P. 32.2(a). Second, "[a]s soon as practical after a verdict or finding of guilty . . . on any count in an indictment or information regarding which criminal forfeiture is sought, the court must determine what property is subject to forfeiture," and, "[i]f the government seeks a personal money

26

judgment, the court must determine the amount of money that the defendant will be ordered to pay." Fed. R. Crim. P. 32.2(b)(1)(A). Then, "[i]f the court finds that property is subject to forfeiture, it must promptly enter a preliminary order of forfeiture setting forth the amount of any money judgment, directing the forfeiture of specific property, and directing the forfeiture of any substitute property if the government has met the statutory criteria." Fed. R. Crim. P. 32.2(b)(2)(A). "Unless doing so is impractical, the court must enter the preliminary order sufficiently in advance of sentencing to allow the parties to suggest revisions or modifications before the order becomes final . . . ." Fed. R. Crim. P. 32.2(b)(2)(B). The preliminary forfeiture order becomes final as to the defendant "[a]t sentencing -- or at any time before sentencing if the defendant consents." Fed. R. Crim. P. 32.2(b)(4)(A).

Here, the district court erred by failing to enter a preliminary forfeiture order after the jury rendered its verdict and before the sentencing hearing. See United States v. Marion, 562 F.3d 1330, 1339 (11th Cir. 2009) ("The Federal Rules of Criminal Procedure have the force and effect of law. Just as a statute, the requirements promulgated in these Rules must be obeyed." (quotation omitted)). Notably, there is nothing in the record, and the government has pointed us to nothing, that would have rendered doing so impractical. See Fed. R. Crim. P. 32.2(b)(2)(B). But harmless-error analysis clearly applies to the examination of

27

this issue. See Fed. R. Crim. P. 52(a) ("Any error, defect, irregularity, or variance that does not affect substantial rights must be disregarded"); United States v. Martin, 662 F.3d 301, 307-10 (4th Cir. 2011) (affirming forfeiture order, despite district court's failure to enter a preliminary order prior to the sentencing hearing and to make the order final at sentencing, as required by Fed. R. Crim. P. 32.2 (2004), where the defendants had notice both of the pending forfeiture and the amount sought by the government).

The record unambiguously establishes that Farias had fair notice prior to the sentencing hearing that the government would seek forfeiture. For one thing, both the original and superseding indictments contained a forfeiture count. See Fed. R. Crim. P. 32.2(a). Thus, the superseding indictment contained the following clause:

> Upon conviction of a conspiracy to commit a violation of Title 18, United States Code, Sections 2314 and 2342, as alleged in this Superseding Indictment, the defendant so convicted shall forfeit to the United States of America all of his respective right, title and interest in any property, real or personal, which constitutes or is derived from proceeds traceable to such violation, pursuant to Title 18, United States Code, Section 981(a)(1)(C).

Second, the government confirmed its intent to seek forfeiture at trial, when, in response to the court's inquiry whether there were any forfeiture issues for the jury, the government noted that it would be seeking a "monetary judgment on the amount of the profit," which the parties agreed was not a jury issue. What's more,

28

at sentencing, both the government and defense counsel indicated that the parties had actually been negotiating the amount of the forfeiture prior to the sentencing hearing.

Farias also had notice of the specific amount ordered forfeited. At the trial, an ATF financial analyst, John Mark Crawford, testified that Farias's bank statements indicated that his profit from the seven charged transactions was approximately $320,000. The government also introduced a profit chart, which the defense did not dispute, showing the analyst's calculations. Then, at sentencing, when the government sought a higher forfeiture amount of $719,538.60 based on the market price of the cigarettes, defense counsel argued that, to the extent forfeiture was appropriate, Farias should be required to forfeit only the amount of his personal profit, which was $331,426. The court ultimately agreed with Farias, and entered a forfeiture judgment in the lesser amount, that is for $331,426. We also observe that Farias had a full opportunity to contest the forfeiture at the sentencing hearing. Thus, we cannot see how he was prejudiced in any way by the district court's failure to comply with Rule 32.2, and we can confidently say the error was harmless.

We are also unpersuaded by Farias's alternate claim that the district court erred by denying his request to make his forfeiture liability joint and several with Valvo. The court ordered Farias to forfeit only the amount of his personal profit.

29

Farias has shown no basis for making this liability joint and several with Valvo, where he has agreed that the amount he was ordered to forfeit represents his own proceeds from the offense. See United States v. Browne, 505 F.3d 1229, 1278 (11th Cir. 2007) (explaining that joint and several forfeiture liability is appropriate, in a conspiracy case, where it is impractical to require the government to determine the precise allocation of proceeds between codefendants).

Nor, as Farias argues, did the government waive its right to seek forfeiture when it decided not to seize the cigarettes involved in the sting operation. The superseding indictment alleged that the proceeds of the offense were forfeitable under the civil forfeiture statute, 18 U.S.C. § 981(a)(1)(C). Section 981(a)(1)(C) authorized a forfeiture money judgment for the conspiracy to traffic in stolen goods, see United States v. Kaley, 579 F.3d 1246, 1250 n.3 (11th Cir. 2009), regardless of whether the government attempted to seize the cigarettes involved in the sting operation, pursuant to 18 U.S.C. § 2344(c).

Accordingly, we affirm Farias's conviction for conspiracy and the district court's order that he forfeit $331,426.

**AFFIRMED.**