[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 16-11049

_____

D.C. Docket No. 1:14-cr-20750-JAL-4

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

ANTHONY MINCEY,
ALEJANDRO AMOR,

Defendants-Appellants.

_____

Appeals from the United States District Court
for the Southern District of Florida

_____

(January 22, 2020)

Before ROSENBAUM, TJOFLAT and HULL, Circuit Judges.

HULL, Circuit Judge:

Defendants Alejandro Amor and Anthony Mincey appeal after a jury convicted them for their roles in a scheme to obtain federal student aid funds from the U.S. Department of Education by submitting falsified documents to secure loans in connection with ineligible students.  After careful review of the record and the briefs of the parties, and having the benefit of oral argument, we conclude that the defendants' challenges to their convictions and sentences are without merit.  Accordingly, we affirm Amor and Mincey's convictions and sentences.

## I.  BACKGROUND

We briefly set forth the pertinent facts from the jury trial, viewing the evidence in the light most favorable to the government and resolving all reasonable inferences in favor of the jury's verdict.  United States v. Hano, 922 F.3d 1272, 1293 (11th Cir.), cert. denied, No. 19-6053, 2019 WL 5686692, (U.S. Nov. 4, 2019); United States v. To, 144 F.3d 737, 743 (11th Cir. 1998).

## A.  Defendant Alejandro Amor

Defendant Amor was the owner and president of FastTrain College—a for-profit technical college with multiple campuses in Florida.  Students attending FastTrain learned vocational skills in areas like computer repair, nursing, and medical billing.  Upon completing FastTrain's programs, students earned college certificates.

2

President Amor applied to the Department of Education to secure FastTrain's eligibility to receive federal financial aid.  FastTrain was approved to participate in federal student aid programs under Title IV of the Higher Education Act of 1965 ("Title IV").  For those Title IV programs, the Department of Education transfers the student loan funds directly to the schools, which in turn transfer the money to the students' accounts.  President Amor set up bank accounts for each FastTrain campus to request and receive these wire transfers from the government.

Qualifying students were therefore able to pay their tuition at FastTrain with federal student loan money.  To be eligible to receive federal financial aid, students were required to possess a high school diploma, a GED, or other equivalent credential, such as having completed six credit hours of college-level work. Students who did not graduate high school or have an equivalent credential were not eligible for federal financial aid—a fact that President Amor was apprised of when he applied to qualify FastTrain to receive federal financial aid.

Initially, FastTrain used standard techniques to recruit its students, such as attending job fairs, calling prospective students, and advertising.  In early 2010, however, the school began experiencing a significant decline in student enrollment, such that President Amor realized that "there wasn't going to be enough money to

sustain the current operations."  As a result, towards the end of that year, there was a dramatic shift in how FastTrain handled student enrollments.

FastTrain's admission strategy changed to one where admission representatives would go out into the neighborhoods to recruit low-income and unemployed students.  President Amor directed admission officers to aggressively target "low-income resource kids" who were working dead-end jobs and solicit recruits outside unemployment offices, flea markets, homeless shelters, and the Florida Department of Children and Families office, among other places. FastTrain's admission officers referred to this tactic as the "snatch-and-grab."

In addition, at President Amor's direction, FastTrain's admission officers (1) began to intentionally recruit prospective students who did not have high school diplomas or the equivalent, and (2) coached them to lie to FastTrain's financial aid officials and claim that they had graduated from high school.

More significantly, FastTrain not only advised prospective students to falsely report their graduation status on their Free Application for Federal Student Aid ("FAFSA"), but FastTrain enrolled the students and accepted their student loan funds.  Soon after starting classes, many of these students dropped out, never earning their college certificates.  Yet, the students were obligated to repay their student loans.

4

When some admission officers raised concerns about enrolling students without high school diplomas, President Amor assured them that, "[a]s long as the student puts Mickey Mouse diploma [on the application], then that's what we go off" of because "[i]f the student lies, they're going to get in trouble" not the admission officers.

To make ineligible students appear qualified for federal financial aid, FastTrain's admission representatives began helping students obtain fraudulent high school diplomas. The admission representatives even started creating fake high school diplomas for students, as well as forging signatures on financial aid documents. In response, President Amor admonished the admission personnel to make the fake diplomas and forgeries look more legitimate.

There was more. President Amor instituted many other strategies to create the false appearance of legitimacy despite FastTrain recruiting and enrolling students without high school diplomas or equivalent qualifications. For instance, Amor (1) wrote "CYA" emails that reiterated FastTrain's formal policy against recruiting ineligible students, (2) deleted an internal record, written by a financial aid representative, reflecting that an admission representative coached an applicant to lie about qualifications, and (3) created an ethics hotline for students and personnel to report concerns. Amor also set up a "secret shopper" program, designed to discover if admission officials were enrolling ineligible students. In

5

this program, President Amor arranged encounters between planted prospective students without high school diplomas and FastTrain admission officials, to test whether the admission staff would enroll the ineligible students. In reality, Amor warned admission representatives in advance of when the planted students would be coming. And even if the admission representatives failed the program by enrolling the ineligible students, they faced no consequences.

## B. Defendant Anthony Mincey

Defendant Mincey was an admission representative at FastTrain's Jacksonville campus when the new aggressive recruiting techniques were implemented. After being trained on FastTrain's new enrollment methods, Mincey recruited students who did not have high school diplomas. In fact, six former FastTrain students identified Mincey as an admissions officer who recruited them or assisted in their enrollment, and several confirmed that Mincey instructed them to lie about being high school graduates. All six students enrolled at FastTrain, attended classes for which financial aid was disbursed, but did not complete their programs.

In a recorded telephone conversation, Mincey told another admission official that he had adapted to FastTrain's "snatch and grab" tactics—a recruiting strategy that had helped the school enroll high numbers of students. That admission official suggested that FastTrain's employees might get in trouble for "bringing all these

people with no diplomas." But Mincey disagreed and explained that the "school is covered" by a "new enrollment agreement," which states that the student who signs it has not been persuaded by anyone or promised anything in connection with enrollment. According to Mincey, this new enrollment agreement made the students responsible for lying about their credentials, not FastTrain.

## C. FastTrain College Closes

After catching wind of the scheme, the federal authorities executed search warrants at FastTrain's campuses, and the college shut down in June 2012. Financial records documented that FastTrain received $29 million in Title IV funds between May 2008 and June 2012, which were deposited in eight bank accounts controlled by defendant Amor. Specifically, FastTrain received federal funds as follows: (1) $351,000 in 2008; (2) $3.6 million in 2009; (3) $6.5 million in 2010; (4) $12.7 million in 2011; and (5) $6 million in the first half of 2012.

## D. Second Superseding Indictment

Ultimately, Amor, Mincey, and five other co-conspirators were charged with crimes related to their involvement in FastTrain's financial aid scheme. A second superseding indictment ("indictment") charged Amor and Mincey with conspiracy to knowingly embezzle, steal, purloin, and convert U.S. property—federal student aid funds—in violation of 18 U.S.C. §§ 371 and 641 (Count 1). The indictment alleged that Amor and Mincey, along with their co-conspirators, caused students

without high school diplomas to submit FAFSAs to the Department of Education falsely and fraudulently indicating that the student had graduated from high school or had a GED. As a result of these false and fraudulent FAFSAs, Amor received federal student loans from the Department of Education and he used the proceeds for his own benefit, the benefit of others, and to further the fraud scheme.

Additionally, that indictment charged (1) defendant Amor with 12 substantive theft of government funds counts, 18 U.S.C. § 641, related to his knowingly obtaining federal student aid funds for six ineligible students (Counts 2-13); and (2) defendant Mincey with four substantive theft of government funds counts, 18 U.S.C. § 641, related to his securing federal student aid funds for two ineligible students (Counts 8, 9, 12, and 13).

The indictment also contained two pages of "Forfeiture Allegations." Those Allegations expressly notified the defendants that upon conviction of any of the charged offenses, each defendant shall forfeit any property, real or personal, which constituted or was derived from proceeds traceable to the offense, pursuant to 18 U.S.C. § 981(a)(1)(C). The Forfeiture Allegations further asserted that approximately $4.7 million was the property subject to forfeiture, as it represented the proceeds of the charged offenses.

**E.  Trial and Sentencing**

8

In October and November 2015, defendants Amor and Mincey proceeded to a 22-day jury trial, during which over 50 witnesses testified.  Notably, three co-conspirators, who had previously pled guilty, testified for the government.  These co-conspirators, Juan Arreola, Luis Arroyo, and Jose W. Gonzalez, explained in detail how, at Amor's direction, FastTrain admission representatives (1) recruited students without high school diplomas, and (2) coached them to falsely report their graduation status on financial aid documents in order to obtain student loan funds for which the students were not eligible.

The government also presented the testimony of several former FastTrain students who confirmed that FastTrain, including Mincey as the specific admissions official, recruited them despite knowing that they were ineligible for federal student aid and directed them to lie on financial aid applications about their credentials.  In turn, FastTrain received federal student loan disbursements for the students.  These ineligible students included the six individuals whose student loans were the basis of the 12 substantive § 641 counts against Amor and Mincey.

FBI Forensic Accountant Mary E. Wilson also testified that she reviewed various FastTrain bank accounts controlled by defendant Amor, which received all the proceeds from the Department of Education.  Ms. Wilson testified that defendant Amor used a portion of the federal student loan money to pay for his personal and family expenses.  Specifically, Ms. Wilson reported that $49,000

9

flowed from FastTrain's operating accounts to pay for expenses related to Amor's airplane, $83,000 for his waterfront home, and $93,000 for his yacht. In addition, another $3.8 million moved from FastTrain's accounts to the Amors' personal accounts and even more FastTrain money went to Amor's purchase of a Jaguar automobile, an investment property, and cash.

Ms. Wilson explained further that, when Amor sold two of the FastTrain campuses, the profits from those sales—$900,000 and $974,000, respectively— were transferred to Amor's personal bank accounts. Four days after selling the campuses, Amor paid off the $1.2 million balance remaining on the mortgage of his personal residence. Ms. Wilson confirmed that the only source of income in Amor's bank accounts was from FastTrain and about 80% of the funds in his personal accounts were federal funds.

On November 24, 2015, the jury found defendant Amor guilty on all counts (Counts 1-13) and Mincey guilty of the conspiracy count (Count 1). The district court acquitted Mincey of the substantive § 641 counts and ultimately sentenced him to 33 months' imprisonment and ordered him to pay restitution.

The district court sentenced Amor to 97 months' imprisonment on the substantive § 641 counts (Counts 2-13), and 60 months as to the conspiracy count (Count 1), all to run concurrently. The district court ordered that Amor pay restitution of $1.9 million, entered a forfeiture money judgment of $1.9 million

10

against Amor, and ordered forfeiture of substitute assets to satisfy the judgment. This is the defendants' appeal.

## II.  ISSUES ON APPEAL

On appeal, defendant Mincey argues that there was insufficient evidence to support his conspiracy conviction in Count 1.  Mincey also joins defendant Amor in arguing that their convictions should be vacated because the government failed to establish the elements of a § 641 substantive offense or conspiratorial object.

On appeal, defendant Amor raises a host of additional issues.  As to trial errors, defendant Amor argues that (1) the district court erroneously admitted evidence of his pre-existing wealth and testimony that FastTrain employed "strippers" or "provocatively dressed" individuals as admission representatives and recruited students from the "hood"; (2) the district court erroneously excluded (i) a video recording of FastTrain's 2011 graduation day, (ii) a defense witness who would have testified that Amor never instructed him to do anything illegal with regard to financial aid, (iii) the testimony of a witness, who would have said that one of the government's witnesses was fired for improprieties, (iv) two video recordings of student testimonials recounting positive experiences at FastTrain, and (v) the forensic accounting expert's draft report; and (3) the district court erred in rejecting Amor's proposed jury instruction regarding the legal requirements for

11

students to be eligible to receive federal student loans.  Amor contends that the cumulative effects of these trial errors deprived him of due process.

As to sentencing, Amor argues that the district court erred in calculating the loss amount and restitution, in applying an abuse of trust enhancement, and in imposing a procedurally and substantively unreasonable sentence.  As to his assets, Amor claims the district court erred in denying him access to his untainted assets in order to fund his defense prior to sentencing and related phases of the case. Lastly, Amor challenges the district court's forfeiture rulings, arguing that the district court (1) exceeded its jurisdiction by entering a forfeiture money judgment and ordering forfeiture more than a year after sentencing, (2) used the wrong definition of proceeds in determining forfeiture, and (3) failed to hold a forfeiture hearing before ordering forfeiture.

After thorough review of the record and with the benefit of oral argument, we conclude that Mincey's and Amor's arguments on appeal are patently meritless and warrant no further discussion, except for Amor's challenges to the district court's forfeiture rulings.

### III.  FORFEITURE PROCEDURAL HISTORY

We first detail how forfeiture was handled in the district court.  The background facts are undisputed.

In the indictment, the Forfeiture Allegations set forth that, upon conviction of the charged offenses, Amor shall forfeit any property, real or personal, which was derived from the proceeds traceable to his crimes. The indictment specifically identified the property subject to forfeiture as: $4.7 million in U.S. currency, which represented the proceeds of Amor's charged offenses (hereinafter "criminal proceeds").

The Forfeiture Allegations further provided that, if that $4.7 million in criminal proceeds could not be located by the government because, among other reasons, the money had been transferred or commingled with other property, the government was entitled to forfeiture of substitute property. The indictment then listed the following property as potentially being subject to forfeiture as substitute assets: four pieces of real property—including two condominiums—three motor vehicles, three vessels, an airplane, and the contents of two financial bank accounts.

Before trial, defendant Amor and the government filed a motion for approval of a stipulation to sell real properties, which requested permission to sell the Amors' two condominiums because Amor did not have the financial means to pay the expenses associated with the units. The district court approved the motion, the condominiums were sold, and the net proceeds, $286,282.58, were placed in the custody of the U.S. Marshals by stipulation of the parties.

13

At the close of the November 2015 trial, the government and defendant Amor informed the district court that they had agreed not to retain the jury for forfeiture. Rather, if Amor was convicted, the parties agreed that the district court would make the forfeiture decision. Amor also did not contest the continued restraint of his funds.

## A. December 2015 Joint Status Report

On December 18, 2015, a few weeks after the jury verdict, the parties submitted a joint status report, informing the district court that Amor's defense counsel and the government had met to discuss forfeiture matters. In that report, the parties recognized that the government would be seeking a "forfeiture money judgment" against Amor. Indeed, because the jury found Amor guilty of the various § 641 counts, Amor was required to forfeit the proceeds of his charged offenses, pursuant to 18 U.S.C. § 981(a)(1)(C). To that end, the parties agreed, "the amount of the forfeiture money judgment against Defendant Amor would be based on the amount of proceeds derived from the offenses of conviction." Because Amor's criminal proceeds had been transferred, disbursed, or commingled with other property, the government confirmed that it would be seeking forfeiture of substitute property in order to satisfy the ultimate "forfeiture money judgment."

Importantly for this appeal, the parties further agreed to continue efforts to calculate an "agreed-upon amount" for the "forfeiture money judgment." Once

14

that figure was determined, the government would seek a forfeiture money judgment in that amount and forfeiture of specific substitute property in satisfaction thereof.  In turn, Amor consented to not transferring or encumbering any property until such time as the forfeiture money judgment was fully satisfied.  Amor also "agreed with the United States to the continued restraint" of the $286,282.58 in proceeds derived from the sale of his two condominiums.

Despite their efforts, the parties were not able to agree on the amount of proceeds derived from Amor's offenses.  Rather, before sentencing, Amor objected strenuously to the government's loss amount calculation for his guidelines calculation, and that loss amount related to the amount of "criminal proceeds" for purposes of the "forfeiture money judgment."  Given the complexities in analyzing the loss calculation under the guidelines, Amor asked the district court to continue his sentencing hearing, which the district court rescheduled for March 9, 2016.

## B.  Government Filed March 2016 Motion for Forfeiture Before Sentencing

Prior to Amor's sentencing hearing, on March 4, 2016, the government filed a Motion for a Forfeiture Money Judgment and a Preliminary Order of Forfeiture, pursuant to 18 U.S.C. § 981(a)(1)(C), 21 U.S.C. § 853, 28 U.S.C. § 2461, and Federal Rule of Criminal Procedure 32.2(b)(2).  In its motion, the government sought a "forfeiture money judgment" equal to the value of the proceeds derived from Amor's crimes, which it estimated to be approximately $4.6 million.

15

Because it was impossible to recover the direct cash proceeds from Amor's criminal offenses, the government sought forfeiture of substituted assets to satisfy the money judgment, i.e., money held in Amor's bank accounts, real estate, motor vehicles, vessels, an airplane, and proceeds from the sale of real property.

## C.  March 2016 Sentencing Hearing

On March 9, 2016, the district court held a sentencing hearing.  Among other matters, Amor challenged the government's loss amount calculation, which was based on a list of over 600 FastTrain students it alleged had been ineligible to receive federal student loans.  Amor argued, inter alia, that the government's methodology for identifying ineligible students was neither reliable nor precise and that it had proven loss for only the 20 FastTrain students who testified at trial.  The district court heard testimony on whether certain students were ineligible to receive federal student loans, but continued the hearing due to time constraints.

## D.  Defendant Amor's April 2016 Forfeiture Memorandum

On April 11, 2016, Amor filed a sentencing memorandum regarding forfeiture.  Amor acknowledged that the government was seeking a "forfeiture money judgment" against him in the amount of his criminal proceeds.  Notably, Amor did not contest that he was subject to a forfeiture money judgment given his convictions.  Amor instead informed the court that the parties had "agreed to resolve any forfeiture issues after Amor was sentenced."

In particular, since Amor challenged the government's loss calculation and "that calculation bears direct relevance to any forfeiture based upon a 'proceeds traceable' theory, both the government and Amor agreed that forfeiture would be resolved by the Court once sentencing had been concluded."  Amor emphasized that he and the government disagreed about the method for calculating the forfeiture amount.

## E.  May 2016 Sentencing Hearing

On May 2, 2016, the district court held another sentencing hearing, where it determined that $1.9 million was "a reasonable estimate of loss" attributable to Amor for purposes of the Sentencing Guidelines.  Using that loss amount, the district court calculated Amor's adjusted offense level as 28, which with his criminal history category of I, yielded an advisory guidelines range of 78 to 97 months' imprisonment.  The district court then sentenced Amor to a total 97 months' imprisonment and ordered that Amor pay restitution.[1]  But upon the government's request, the court scheduled a separate restitution hearing for June 6, 2016, to determine the amount of restitution due.

Next, the government asked the district court to defer ruling on forfeiture until after the restitution hearing.  The court asked Amor if he had any objection.  Amor's counsel addressed restitution and said only that he "never had a situation

---

[1]The district court also sentenced Amor to three years' supervised release, fined him $15,000, and assessed $1,300 in fees.

where restitution was split from a sentence." However, importantly to this appeal, Amor did not object to the court deferring its forfeiture determination. Noting that the parties disputed the forfeiture amount, the district court found that "the forfeiture should not be determined until the restitution is determined, though, pursuant to statute, it's supposed to be as quickly as possible."

## F. May 2016 Judgment

The next day, on May 3, 2016, the district court entered a written judgment and commitment order containing its above sentencing decisions. Because the district court was unable to calculate the amount of the "forfeiture money judgment" before sentencing, the court ordered that Amor "shall forfeit" his interest in property to the United States but deferred determining the forfeiture amount until the restitution hearing. Specifically, the written judgment stated: "The defendant shall forfeit the defendant's interest in the following property to the United States: Deferred until restitution hearing."

Similarly, as to restitution, the written judgment provided that Amor owed restitution, but deferred determination of the restitution amount until the June 6, 2016 restitution hearing. Amor filed a timely notice of appeal.

## G. Government's June 2016 Amended Motion for Forfeiture

Meanwhile, a month later, on June 2, 2016, the government filed an Amended Motion for a Forfeiture Money Judgment and Preliminary Order of

Forfeiture, seeking a forfeiture money judgment in the amount of $1.9 million, which represented Amor's criminal proceeds. To satisfy the money judgment, the government asked the district court to order forfeiture of the specific substitute assets listed in Attachment 1 to its Motion. The government disclosed that the value of the substitute property it sought for forfeiture was approximately $3.2 million, which included new assets it had recently found and the substitute assets it identified in its prior motion.

## H.  June 6, 2016 Restitution Hearing

At the June 6 restitution hearing, the district court found that Amor owed $1.9 million in restitution, which it said was the amount of actual loss to the Department of Education. The district court then turned to forfeiture. Amor requested additional time to respond to the government's pending Amended Motion for a Forfeiture Money Judgment and a Preliminary Order of Forfeiture. The district court agreed to give Amor time to respond to the government's Amended Motion. The court then indicated that it would defer entering the restitution order until the forfeiture amount was decided, at which time the court would issue an amended judgment and commitment order addressing both issues. Once again, Amor did not object to delaying the determination of the forfeiture amount. Rather, Amor objected only to the court entering the restitution order at a later date.

19

## I.  Further Briefing on Amended Forfeiture Motion

On June 17, 2016, Amor filed his response in opposition to the government's Amended Motion for a Forfeiture Money Judgment and Preliminary Order of Forfeiture.  For the first time (and over six weeks after the May 3 sentencing), Amor argued that any order on forfeiture would be untimely and improper because the government failed to obtain a forfeiture judgment or forfeiture determination at sentencing, in violation of Federal Rule of Criminal Procedure 32.2.

Of course, as shown above, (1) Amor's April pre-sentencing memorandum had suggested that forfeiture be determined "after sentencing had concluded," and (2) at his May 3 sentencing, Amor had not objected to delaying a determination of the forfeiture amount.  In his response, Amor also argued that the government failed to establish that the amount of forfeiture due was $1.9 million, pointing out that FastTrain's net proceeds during the relevant period were $231,000.

Ten days later, on June 27, 2016, the government replied to Amor's response, arguing that forfeiture was timely, as it had complied with Rule 32.2 by including the Forfeiture Allegations in Amor's indictment and moving for a preliminary order of forfeiture prior to sentencing.  Moreover, the government

20

argued that the district court had retained jurisdiction to enter a forfeiture order because, before the time of sentencing, and at the sentencing hearing, Amor was aware that forfeiture would be part of his sentence. We note that, at the sentencing hearing, the district court also asked if Amor had any objection to it deferring ruling on forfeiture until after the restitution hearing and Amor did not object to the court doing so. In its reply, the government highlighted also that Amor specifically asked the district court at the restitution hearing to delay ruling on the amount of forfeiture until after he responded to the government's Amended Motion. As to amount, the government maintained that a $1.9 million forfeiture money judgment was appropriate because Amor should forfeit all the illegal proceeds he received directly or indirectly from FastTrain.

**J. October 2016 to February 2017 Proceedings Before Magistrate Judge**

On October 19, 2016, the district court referred the government's Amended Motion for a Forfeiture Money Judgment and a Preliminary Order of Forfeiture to a magistrate judge. That same day, the magistrate judge directed the parties to provide notice as to whether a hearing, evidentiary or otherwise, was required for the government's motion. While the government responded that an evidentiary hearing was not necessary, Amor requested an evidentiary hearing "because the amount of any forfeiture is contested." In his written submission, Amor advised that an evidentiary hearing should take approximately two hours.

21

The forfeiture hearing was initially set for November 28, 2016, but the magistrate judge continued the hearing twice—first upon Amor's counsel's request and second so that defendant Amor could be present at the hearing. Ultimately, on January 13, 2017, the magistrate judge held the evidentiary hearing on the forfeiture matter. But Amor and the government had no live witness testimony to present, nor did they have any new exhibits to introduce. By agreement of the parties, the court reporter was dismissed. Amor also conceded that he had waived his right to have an evidentiary hearing on the motion.

At some point later in the hearing, Amor specifically withheld consent to the magistrate judge handling the forfeiture motion and lodged a formal objection to the magistrate judge's continued involvement in the forfeiture portion of his criminal case. The magistrate judge then ordered briefing on whether a federal magistrate judge has jurisdiction to determine forfeiture matters in a criminal case absent the parties' consent. Soon after briefing was completed, the magistrate judge issued a report, recommending that the district court rescind its referral because he did not have jurisdiction to rule on the government's forfeiture motion.

## K.  May 2017 Forfeiture Money Judgment

In light of Amor's withheld consent, on May 26, 2017, the district court (1) vacated its prior referral of the government's Amended Motion for a Forfeiture Money Judgment and a Preliminary Order of Forfeiture, and (2) ruled on the

22

government's motion.  First, the district court determined that the government's motion was timely and noted that, even before the sentencing hearing, the government initially moved for a forfeiture money judgment and preliminary order of forfeiture.  Second, the district court found that the facts and circumstances of the case made it impractical to enter a preliminary order of forfeiture prior to sentencing.  But in accordance with Rule 32.2, the court had ensured that Amor knew of the forfeiture at sentencing.  Third, the district court found that, in light of the history of the proceedings and the facts and circumstances of the case, the soonest practical time for the district court to determine the forfeiture amount was in the current order after the issue was fully briefed.  And fourth, the court found that Amor had suffered no prejudice from the delay.

As to the forfeiture amount, the district court determined that the government's trial and sentencing evidence had established by a preponderance that $1.9 million was subject to forfeiture as proceeds traceable to Amor's crimes. The district court thus ordered a forfeiture money judgment of $1.9 million against Amor.

The district court also ruled that the government was entitled to an order of forfeiture of substitute assets to satisfy that $1.9 million money judgment.  But the court denied without prejudice the government's request for the forfeiture of the specific property listed in Attachment 1 to its Amended Motion because the $3.2

million estimated value of the substitute assets exceeded the $1.9 million money judgment.

## L.  Government's May 2017 Amended Motion for Forfeiture Order

On May 30, 2017, the government filed an Amended Motion for a Preliminary Order seeking forfeiture of substitute assets worth $477,429.68, in partial satisfaction of the $1.9 million forfeiture money judgment.  Amor opposed the motion, arguing that the government failed to secure a preliminary forfeiture order prior to sentencing and failed to obtain either a forfeiture judgment or forfeiture determination at sentencing.

## M.  July 2017 Preliminary Order of Forfeiture

After receiving additional briefing from the parties, on July 26, 2017, the district court entered a preliminary order of forfeiture, ordering that Amor forfeit the $477,429.68 in substitute assets to the United States as listed in the government's motion.  The next day, July 27, 2017, the district court amended Amor's judgment to provide: "The defendant shall forfeit the defendant's interest in the following property to the United States: Items listed in the Preliminary Order of Forfeiture entered on 7/26/17."  The district court also amended the judgment to include its determination that Amor owed $1.9 million in restitution.  Amor timely filed an amended notice of appeal.

## IV.  DISCUSSION

24

On appeal, Amor argues that the district court violated the procedural requirements of Rule 32.2 by entering its preliminary forfeiture order in June 2017, more than a year after he was sentenced in May 2016. According to Amor, the government's failure to timely obtain a forfeiture money judgment or preliminary order of forfeiture, either before or at sentencing, constitutes a jurisdictional defect that bars a later imposition of a forfeiture penalty. Amor also argues that the district court used the wrong definition of proceeds in determining the forfeiture amount. Lastly, Amor contends that the court erred by ordering forfeiture without ever holding a forfeiture hearing and violated Federal Rule of Criminal Procedure 43 by ordering forfeiture in his absence. For these reasons, Amor contends that the district court's forfeiture orders should be vacated. We address each argument in turn.

## A.  Standard of Review

We review de novo the district court's legal conclusions regarding forfeiture and its factual findings for clear error. United States v. Farias, 836 F.3d 1315, 1323-24 (11th Cir. 2016); United States v. Hernandez, 803 F.3d 1341, 1342 n.1 (11th Cir. 2015) (per curiam). We review questions of subject-matter jurisdiction de novo. United States v. Petrie, 302 F.3d 1280, 1284 (11th Cir. 2002).

## B.  Provisions in Rule 32.2

We first consider Amor's arguments that (1) the district court violated Rule 32.2, and (2) its Rule 32.2 violation meant that the district court lacked jurisdiction to enter a forfeiture money judgment and a preliminary order of forfeiture more than a year after sentencing.

Forfeiture is one portion of a defendant's sentence.  United States v. Gilbert, 244 F.3d 888, 924 (11th Cir. 2001), superseded by rule on other grounds as recognized in United States v. Marion, 562 F.3d 1330 (11th Cir. 2009); see also Libretti v. United States, 516 U.S. 29, 39, 116 S. Ct. 356, 363 (1995) (providing that "criminal forfeiture [is] an aspect of punishment imposed following conviction of a substantive criminal offense").  Here, because the government included a notice of forfeiture in the indictment and defendant Amor was convicted of the theft-of-government-funds offenses, under 18 U.S.C. § 641, and conspiracy to commit theft of government funds, under 18 U.S.C. §§ 371 and 641, forfeiture of Amor's criminal proceeds was mandatory.  See 18 U.S.C. § 981(a)(1)(C); Hernandez, 803 F.3d at 1342-43 (holding that a district court was required by law to grant the government's forfeiture motion against a defendant who was convicted of theft of government funds, 18 U.S.C. § 641, and who was placed on notice of the forfeiture in his indictment).

Rule 32.2 of the Federal Rules of Criminal Procedure sets forth the procedure for including forfeiture as part of a defendant's sentence.  Fed. R. Crim.

26

P. 32.2; see Petrie, 302 F.3d at 1284 (explaining that "the forfeiture scheme prescribed in Rule 32.2 is detailed and comprehensive").  First, the government must include a forfeiture allegation in the indictment against the defendant.  Fed. R. Crim. P. 32.2(a).  Second, "[a]s soon as is practical" after conviction, "the court must determine what property is subject to forfeiture under the applicable statute."  Fed. R. Crim. P. 32.2(b)(1)(A).  If the government seeks a personal "money judgment," the district court "must determine the amount of money that the defendant will be ordered to pay."  Id.

Then, if the district court finds that property is subject to forfeiture, "it must promptly enter a preliminary order of forfeiture setting forth the amount of any money judgment" and "directing the forfeiture of any substitute property."  Fed. R. Crim. P. 32.2(b)(2)(A).  As to the timing of the preliminary forfeiture order, Rule 32.2 states: "Unless doing so is impractical, the court must enter the preliminary order sufficiently in advance of sentencing to allow the parties to suggest revisions or modifications before the order become final as to the defendant."  Fed. R. Crim. P. 32.2(b)(2)(B).

If the district court cannot calculate the total amount of the money judgment before sentencing, Rule 32.2(b)(2)(C) provides that the district court may enter a general forfeiture order against the defendant that, inter alia, "states that the order will be amended under Rule 32.2(e)(1) when . . . the amount of the money

judgment has been calculated." Fed. R. Crim. P. 32.2(b)(2)(C)(iii); see id., advisory committee's note to 2009 amendment (explaining that Rule 32.2(b)(2)(C) authorizes a court "to issue a forfeiture order describing the property in 'general' terms, which order may be amended pursuant to Rule 32.2(e)(1) when additional specific property is identified").

## C. Amor's Forfeiture Proceedings

Based on the unique facts and circumstances of this particular case, we conclude that the district court did not violate Rule 32.2.

To begin, consistent with Rule 32.2(a), the Forfeiture Allegations in the indictment expressly notified Amor that he would be subject to a mandatory forfeiture money judgment as part of his sentence for his convictions. See Fed. R. Crim. P. 32.2(a). The indictment also identified the property subject to forfeiture as: $4.7 million in U.S. currency, which allegedly represented the proceeds of Amor's charged offenses. In addition, the indictment identified various items as potential substitute assets. During trial, Amor and the government discussed forfeiture and agreed that the district court, not the jury, would make the requisite forfeiture determinations. Throughout the entire proceedings, Amor was well aware that, upon conviction, there would be a forfeiture money judgment and that the only forfeiture issue was the amount of the forfeiture money judgment.

28

In fact, soon after his convictions, Amor and the government met to discuss the forfeiture portion of his sentence. Amor and the government even agreed to negotiate an "agreed-upon amount" for the forfeiture money judgment. The parties also acknowledged that, because Amor's criminal proceeds had been transferred, disbursed, or comingled with other property, the government would seek a forfeiture money judgment and the forfeiture of substitute assets to satisfy that judgment. In turn, Amor consented to not transferring or encumbering any property until such time as the forfeiture money judgment was fully satisfied and "agreed with the United States to the continued restraint" of the $286,282.58 in proceeds derived from the sale of his two condominiums.

Ultimately, Amor and the government were unable to settle on an agreed-upon amount for the forfeiture money judgment. Nonetheless and still almost two months before Amor was sentenced, the government filed a formal Motion for a forfeiture money judgment of $4.6 million and a preliminary order of forfeiture. Importantly, while Amor disputed the amount of forfeiture he owed, he never contested that forfeiture would be part of his sentence. Thus, by the time of the May 2016 sentencing hearing, Amor was well aware that forfeiture would be part of his sentence.

At the sentencing hearing, the district court complied with Rule 32.2(b) by ensuring that Amor was aware of the forfeiture. See Fed. R. Crim. P.

29

32.2(b)(4)(B) ("The court must include the forfeiture when orally announcing the sentence or must otherwise ensure that the defendant knows of the forfeiture at sentencing."). More particularly, after announcing Amor's sentence, the district court turned to the pending forfeiture issues, which at that time were the amount of the forfeiture money judgment against Amor and an order of substitute assets to satisfy that judgment. The court acknowledged that the parties disputed the amount of the forfeiture money judgment. But in light of the government's request to hold a separate restitution hearing, the court found that it could not determine the forfeiture amount until after first deciding the restitution amount at a later hearing. The district court ultimately made factual findings explaining why it was impractical to adjudicate the forfeiture amount prior to sentencing—findings that Amor does not challenge on appeal.

Moreover, at sentencing, Amor did not object to the district court's later deciding the forfeiture amount. Instead, there appeared to be an understanding among the parties that the forfeiture amount would be taken up at a later date. See United States v. Ferrario-Pozzi, 368 F.3d 5, 10 (1st Cir. 2004) ("Failing altogether to discuss forfeiture at the sentencing hearing is not the same, however, as purposefully postponing further elaboration on the topic . . . ."). Therefore, even though the district court did not rule on the forfeiture amount at sentencing, it nevertheless complied with Rule 32.2(b) by ensuring that Amor was aware of the

30

forfeiture, and that Amor did not object to the court determining the forfeiture amount after sentencing.

Furthermore, in its written judgment, the district court complied with Rule 32.2(b)(2)(C) when it included the condition that Amor "shall forfeit" his interest in property to the United States, with the actual amount to be determined at the restitution hearing. As noted earlier, the district court's judgment states: "The defendant shall forfeit the defendant's interest in the following property to the United States: Deferred until restitution hearing." We do not consider this statement in isolation but in the context of the prior proceedings and the conduct of the government and defendant Amor. Read in context, the district court ordered generally that Amor "shall forfeit" his interest in property in an amount to be determined later at the restitution hearing.

Given that the government filed a motion for forfeiture before sentencing but the court was unable to calculate the amount of the forfeiture money judgment before sentencing, it was reasonable and entirely permissible under Rule 32.2 for it to enter a written judgment to generally order forfeiture, with the specific amount and subject substitute assets to be determined later. See Fed. R. Crim. P. 32.2(b)(2)(C) (providing that, if a court cannot calculate the amount of the forfeiture money judgment before sentencing, the court may enter a general order of forfeiture and amend it later when the amount of the money judgment has been

31

calculated). Under the facts and circumstances of this case, the later forfeiture money judgment and preliminary order of forfeiture can reasonably be considered an amendment to the existing judgment and thus within the jurisdiction retained by the district court. See Fed. R. Crim. P. 32.2(b)(2)(C)(ii) (explaining that a general order of forfeiture may be amended under Rule 32.2(e)(1) when "the amount of the money judgment has been calculated"). Accordingly, Amor has not shown that the district court violated Rule 32.2 in imposing forfeiture in his particular case.

Even assuming that the district court violated Rule 32.2 by failing to determine the precise amount of the forfeiture judgment prior to or at Amor's sentencing hearing, we conclude that Amor was not prejudiced by the delay. Indeed, this Court has held that the harmless-error analysis applies if a district court violates Rule 32.2. See Farias, 836 F.3d at 1329-30 (holding that a district court's failure to enter a preliminary order of forfeiture before sentencing was harmless error because the defendant was not prejudiced by the court's delay); see also Fed. R. Crim. P. 52(a) ("Any error, defect, irregularity, or variance that does not affect substantial rights must be disregarded.").[2] In Farias, this Court reasoned that a district court's violation of Rule 32.2 was harmless where (1) the defendant had fair notice that the government would seek forfeiture and in what amount and

[2]Even at the restitution hearing, Amor's counsel wanted the court to defer ruling on the forfeiture matters even longer because he needed time to respond to the government's pending forfeiture motion.

(2) the defendant had the full opportunity to contest the forfeiture. Farias, 836 F.3d at 1330.

As noted above, the record unambiguously shows that, from the time he was indicted through his sentencing hearing, Amor was aware that forfeiture would be part of his sentence and the amount sought by the government. In his pre-sentencing memorandum, Amor acknowledged that he was subject to a forfeiture money judgment, with the only outstanding issue being the amount of that money judgment. What's more, Amor and the government indicated that the parties had actually been negotiating the amount of forfeiture prior to the sentencing hearing. Thus, Amor clearly had notice of the specific amount the government sought in forfeiture by way of these negotiations. Of course, the amount the government sought in forfeiture was also set forth in the indictment and the government's forfeiture motions.

Further, at the sentencing hearing, Amor did not object to the district court deferring its decision on the forfeiture amount until a later date. In this regard, Amor and the government contributed to the nature of the forfeiture discussion at the sentencing hearing. The parties apparently understood that the forfeiture amount would be taken up later. This is consistent with what Amor told the district court before sentencing—that he and the government "agreed that forfeiture would be resolved by the Court once sentencing had been concluded."

33

We also conclude that Amor had a full opportunity to contest forfeiture in the district court. In fact, when Amor was not ready to address the pending forfeiture matters at the restitution hearing, the district court gave him more time to fully respond to the government's Amended Motion. Amor also expressly conceded in the district court that he had no further evidence to present regarding forfeiture. In that regard, on appeal, Amor does not challenge the district court's finding that he was not prejudiced by the delay in entering the forfeiture orders.

For all of these reasons, like in Farias, "we cannot see how [Amor] was prejudiced in any way by the district court's [alleged] failure to comply with Rule 32.2, and we can confidently say [any] error was harmless." Id.[3]

## D. Forfeiture Amount

Next, Amor argues that the district court erred in calculating forfeiture because it used the wrong definition of the term "proceeds."

Under 18 U.S.C. § 981(a)(1)(C), Amor was required to forfeit "[a]ny property, real or personal, which constitutes or is derived from proceeds traceable"

---

[3]We acknowledge that Amor cites to Petrie, but defendant Amor's and the government's conduct here, and the district court's written judgment, render this case materially different from Petrie. For example, in Petrie, the government did not file a motion for a preliminary order of forfeiture until six months after sentencing; whereas, here, the government filed its motion before sentencing. See Petrie, 302 F.3d at 1284. In addition, in Petrie, forfeiture was not mentioned at all during defendant Petrie's sentencing hearing, and the district court's written judgment merely stated that Petrie was subject to forfeiture "as cited in count two." Id. In contrast, here, at his sentencing hearing, the district court ensured Amor was aware of the forfeiture, Amor did not object to the district court's deferring its forfeiture determination, and the district court's written judgment provided that Amor "shall forfeit" his interest in property with the amount to be determined at the restitution hearing.

34

to his crimes.  Section 981(a)(2) defines "proceeds" in different ways depending on the nature of the conduct involved in the defendant's crimes.  See id. (providing that "[f]or purposes of paragraph (1), the term 'proceeds' is defined as follows" and then listing different categories).  Thus, the question we must answer is how to define the "proceeds" subject to forfeiture as a result of Amor's criminal conduct.

Amor contends that the district court should have selected the definition of "proceeds" in subsection (B), which applies in "cases involving lawful goods or lawful services that are sold or provided in an illegal manner."  18 U.S.C. § 981(a)(2)(B).  This definition limits forfeiture to the "amount of money acquired through the illegal transactions resulting in the forfeiture, less the direct costs incurred in providing the goods or services."  Id.  The Second Circuit has held, for example, that § 981(a)(2)(B) applies in insider trading cases because "[a] security is a 'lawful good[]' for the purposes of § 981(a)(2)(B), . . . which, if [purchased or sold] based upon improperly obtained material nonpublic inside information, it is 'sold . . . in an illegal manner.'"  United States v. Contorinis, 692 F.3d 136, 145 n.3 (2d Cir. 2012) (some alterations in original).

The district court, on the other hand, adopted the government's view that "proceeds" should be defined under subsection (A), which applies in cases "involving illegal goods, illegal services, unlawful activities, and telemarketing and health care fraud schemes."  18 U.S.C. § 981(a)(2)(A).  This definition

35

provides that the forfeiture amount is the gross profit realized from the offense conduct, that is, "property of any kind obtained directly or indirectly, . . . and is not limited to the net gain or profit realized from the offense." Id. Our sister circuits have concluded, for instance, that embezzlement "cannot be done lawfully, and therefore is properly considered an 'unlawful activity'" within the meaning of § 981(a)(2)(A). See, e.g., United States v. Bodouva, 853 F.3d 76, 80 (2d Cir. 2017) (quotation marks omitted) (rejecting defendant's claim that embezzling money from a company's 401(k) plan constituted providing a lawful service in an illegal manner); United States v. George, 886 F.3d 31, 40 (1st Cir. 2018) (concluding that a defendant politician's embezzlement from regional transit system receiving federal funds "was not the provision of bus services in an illegal manner but, rather, the misappropriation of government resources to his own behoof"); see also United States v. Uddin, 551 F.3d 176, 178, 181 (2d Cir. 2009) (applying § 981(a)(2)(A)'s definition of "proceeds" in a case involving food stamp fraud and conversion of public money).

Here, Amor was convicted of theft of government property, see 18 U.S.C. § 641, and conspiracy to commit theft of government property, see id. §§ 371 and 641. Amor argues that his theft of government property offense is a crime that should be characterized as constituting a lawful service provided in an illegal manner. We disagree.

36

Like embezzlement, theft of government property cannot be done lawfully, and thus, is properly considered an unlawful activity within the meaning of § 981(a)(2)(A). In arguing to the contrary, Amor misidentifies his criminal conduct. Amor's crimes were not providing educational services in an illegal manner. Rather, he was convicted of stealing (and conspiring to steal) government money by enrolling students without high school diplomas or the equivalent credential and coaching those students to lie on their FAFSAs in order to fraudulently obtain federal student loan monies. Amor then used the fraudulently obtained student loan monies for his own benefit and the benefit of others. Accordingly, the definition of "proceeds" in § 981(a)(2)(A) applies here.

## E. Forfeiture Hearing

Amor also argues that the district court erred by failing to hold a forfeiture hearing. It is true that, under Rule 32.2(b)(1)(B), "[i]f the forfeiture is contested, on either party's request the court must conduct a hearing after the verdict or finding of guilty." Fed. R. Crim. P. 32.2(b)(1)(B) (emphasis added). The problem with Amor's position is that he never requested that the district court hold a forfeiture hearing in the first place. Furthermore, before the magistrate judge, he conceded that he had no new evidence to present. Instead, Amor indicated that he was relying entirely on evidence in the record. In light of that representation, the district court determined the forfeiture amount based on the record without holding

37

another hearing.  Rule 32.2 permits just that.  See Fed. R. Crim. P. 32.2(b)(1)(B) ("The court's determination may be based on evidence already in the record, including any written plea agreement, and on any additional evidence or information submitted by the parties and accepted by the court as relevant and reliable.").  Under these circumstances, the district court did not err because Amor waived any right he had for the district court to hold a forfeiture hearing under Rule 32.2.

Amor also argues that the district court violated Federal Rule of Criminal Procedure 43 by entering the forfeiture money judgment and preliminary forfeiture order in his absence.  Under Rule 43, a defendant has a right to be present at sentencing.  Fed. R. Crim. P. 43(a)(3).  As an initial matter, we note that Amor was present at his sentencing hearing, during which the district court ensured that he was aware of the forfeiture.  But in any event, we will assume without deciding that Amor had a right to be present when the district court later amended its general forfeiture order.  But see United States v. Portillo, 363 F.3d 1161, 1166 (11th Cir. 2004) (per curiam) (explaining that "the right to be present at one's sentencing does not translate into a right to be present whenever judicial action modifying a sentence is taken" (quotation marks omitted)).

Amor's claim cannot succeed, however, because he waived any Rule 43 right to be present when the district court entered its later forfeiture orders, since he

38

waived having a hearing in the first place. United States v. Brantley, 68 F.3d 1283, 1291 (11th Cir. 1995) ("Failure to assert the right to presence or to object to a violation of Rule 43 may constitute a valid waiver."). The record shows that Amor was present at the forfeiture hearing held by the magistrate judge, when he waived his right to the evidentiary hearing and invited the court to decide the pending forfeiture issues based on the record evidence. As such, even if there was any Rule 43 error, it was invited. See United States v. Brannan, 562 F.3d 1300, 1306 (11th Cir. 2009) (explaining that the doctrine of invited error "stems from the common sense view that where a party invites the trial court to commit error, he cannot later cry foul on appeal"); United States v. Harris, 443 F.3d 822, 823-24 (11th Cir. 2006) ("Where a party invites error, the Court is precluded from reviewing that error on appeal."). Finally, Amor identifies no prejudice caused by his absence in any event.

## V. CONCLUSION

For the reasons stated above, we affirm Amor's and Mincey's convictions and sentences.

**AFFIRMED.**