[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
August 22, 2002
THOMAS K. KAHN
CLERK

_____

Nos. 01-10262 & 01-13824

_____

D. C. Docket No. 98-00019-CR-1-MMP

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

ROBERT PETRIE,

Defendant-Appellant.

_____

Appeals from the United States District Court
for the Northern District of Florida

_____

**(August 22, 2002)**

Before BARKETT and MARCUS, Circuit Judges, and HIGHSMITH[*], District Judge.

HIGHSMITH, District Judge:

Robert Petrie appeals his conviction and the imposition of a 188-month

sentence of imprisonment for the offense of conspiracy to launder money. Petrie also

_____

[*]Honorable Shelby Highsmith, U.S. District Judge for the Southern District of Florida, sitting by designation.

seeks to vacate a preliminary forfeiture order issued by the district court approximately six months after sentencing.[1]  We affirm Petrie's conviction and sentence.  However, we vacate the preliminary forfeiture order because we conclude that the district court lacked jurisdiction to enter it.

PROCEDURAL AND FACTUAL BACKGROUND

On April 27, 1999, the grand jury returned a superseding indictment charging Petrie and eleven other individuals with the offense of conspiracy to launder funds, which were derived from a specified unlawful activity, namely, wire fraud, over a period of time extending from January 1, 1991, through the date of the indictment. A second count charged that all of the property involved in the criminal offense was subject to forfeiture.  On October 19, 2000, a jury found Petrie guilty of the conspiracy count.  The following day, the jury returned a special forfeiture verdict, finding that the sum of $1 million dollars in funds and other assets remaining at a bank in the Caribbean island of Antigua was property involved in the conspiracy offense or traceable to property so involved.  The jury also found that additional property valued at $23 million was similarly involved in the conspiracy offense or traceable to property so involved.

---

[1]Petrie filed two separate appeals, which have been consolidated.

The testimony presented at trial revealed that the members of the conspiracy advertised and promoted the availability of venture capital funding through the national and international news media. Persons who responded to these offers were initially instructed to submit financial information to a "broker" working for the organization. The broker made sure that the prospective borrower could afford an up-front fee, which typically ran into the thousands of dollars. Thereafter, the borrower was referred to a "syndicator" for the purpose of entering into a funding contract. Upon execution of the contract, the up-front fee was placed in an escrow account pending satisfaction of certain conditions. A key condition was that the borrower had to obtain a payment guarantee, in the form of a letter of credit, from a financial institution within several days of execution of the contract. Obtaining the guarantee required some form of collateral, which, in every instance, the prospective borrower was not able to provide. This resulted in a default on the contract and forfeiture of the up-front fee. At that point, the money was moved to an off-shore financial institution and distributed to the members of the conspiracy.

Testimony from victims and members of the organization established that Petrie participated fully in the scheme and that he profited from it. In addition, Petrie formed his own company in Saint Martin, Netherlands Antilles--"B&L Syndicators", also known as "B&L Securities"--as a vehicle to increase his profits from the criminal

3

enterprise. For sentencing purposes, the district court determined that Petrie, individually and through his company, was responsible for laundering $22,968,446.00.

DISCUSSION

*1. The forfeiture appeal:*

We first address Petrie's appeal of the preliminary forfeiture order ("PFO"). We have an obligation to review, *sua sponte*, whether we have jurisdiction over this appeal. See Zatler v. Wainwright, 802 F.2d 397, 399 (11th Cir. 1986). A PFO is a final and appealable order if the order finally determines the defendant's rights in the forfeited property. See United States v. Gross, 213 F.3d 599, 600 (11th Cir. 2000). See also United States v. Pelullo, 178 F.3d 196, 202-03 (3rd Cir. 1999); United States v. Bennett, 147 F.3d 912, 914 (9th Cir. 1998); United States v. Christunas, 126 F.3d 765, 767-68 (6th Cir. 1997); United States v. Libretti, 38 F.3d 523, 526-27 (10th Cir. 1994), aff'd, 516 U.S. 529 (1995). Because the PFO entered in the present case finally determines Petrie's rights in the property, we find that we have jurisdiction to address Petrie's appeal.

We now turn to the question of whether the district court had jurisdiction to enter the PFO approximately six months after sentencing. Petrie accurately notes that the forfeiture verdict returned by the jury was not mentioned at the sentencing hearing. Moreover, the judgment and commitment order entered on January 8, 2001 merely states that Petrie "was subject to forfeiture as cited in count two." The government waited until June 11, 2001 to move for entry of a PFO. The government sought forfeiture of $1 million in funds and other assets remaining in the Caribbean American Bank located in St. Johns, Antigua, plus an additional $23 million. On June 22, 2001, the district court entered a PFO ordering that a total of $24 million dollars be forfeited to the United States and directing the government to publish notice of the order. The PFO contemplated that, upon adjudication of any third-party interests, a final order of forfeiture would be entered.

We review questions of subject matter jurisdiction *de novo*. See Milan Express, Inc. v. Averitt Express, Inc., 208 F.3d 975, 978 (11th Cir. 2000). Rule 32 of the Federal Rules of Criminal Procedure states that forfeiture procedures are governed by Rule 32.2. Fed. R. Crim. P. 32(d)(2). Pursuant to this rule, upon finding that property is subject to forfeiture, the district court enters a PFO "setting forth the amount of any money judgment or directing the forfeiture of specific property." Fed. R. Crim. P. 32.2(b)(2). The entry of a PFO authorizes the government "to seize the specific

5

property subject to forfeiture" and "to commence proceedings that comply with any statutes governing third-party rights." Fed. R. Crim. P. 32.2(b)(3). At sentencing, "the order of forfeiture becomes final as to the defendant" and "is made a part of the sentence and included in the judgment." Id. In ancillary proceedings, the district court may consider any petitions filed by third-parties claiming an interest in the property to be forfeited. Fed. R. Crim. P. 32.2(c)(1). At the conclusion of the ancillary proceedings, the court enters "a final order of forfeiture by amending the preliminary order as necessary to account for third-party rights." Fed. R. Crim. P. 32.2(c)(2). "If no third-party files a timely claim, the preliminary order becomes the final order of forfeiture." Id. "An ancillary proceeding is not part of sentencing." Fed. R. Crim. P. 32.2(c)(4).

As may be gleaned from the foregoing recitation, the forfeiture scheme prescribed in Rule 32.2 is detailed and comprehensive. Of special note is the fact that the procedure contemplates final disposition of forfeiture issues, as regards a defendant, at the time of sentencing. Indeed, the rule requires that the forfeiture order be made a part of the sentence and included in the judgment. Thus, all post-sentencing activities authorized by Rule 32.2 concern third-party interests. Moreover, nothing in Rule 35 of the Federal Rules of Criminal Procedure provides a basis for modifying the judgment for the purpose of entering an order of forfeiture against a

6

defendant more than seven days after sentencing.[2] We conclude, therefore, that the district court lacked jurisdiction to enter the June 2, 2001 preliminary forfeiture order. Hence, we vacate said order.

## 2. *The appeal of Petrie's conviction:*

Having disposed of the forfeiture appeal, we now turn to Petrie's challenges to his conviction for the offense of conspiracy to launder money. Petrie argues that his federal constitutional rights to a fair trial and due process of law were violated as a result of the district court's rulings and that he was denied the right to present a meaningful defense. Petrie seeks reversal of his conviction and remand for a new trial.

### a.     Exclusion of lawyers' testimony and business records:

Petrie's main contention is that the trial court erred by excluding as irrelevant the testimony of two lawyers proffered by Petrie. Petrie also assigns error to the trial court's determination that a secretary at B&L Securities, through whom Petrie sought

---

[2]Rule 35(c) states, "The court, acting within 7 days after the imposition of sentence, may correct a sentence that was imposed as a result of arithmetical, technical, or other clear error." Fed. R. Crim. P. 35(c). The other subsections of Rule 35 are inapplicable. Rule 35(a) contemplates the correction of a sentence after remand. Rule 35(b) allows, within certain time restrictions, for the reduction of a sentence based on substantial assistance rendered to the government. Fed. R. Crim. P. 35(a)-(b).

to introduce certain business records, was not qualified to testify as to the origination and compilation of the records. According to Petrie, these two issues go hand in hand. "A trial court has broad discretion in determining the admissibility of evidence; its ruling will not be disturbed on appeal absent an abuse of discretion." United States v. Ruiz, 253 F.3d 634, 639-40 (11th Cir. 2001) (per curiam) (quoting United States v. Zapata, 139 F.3d 1355, 1357 (11th Cir. 1998). We review factual findings regarding the admissibility of business records under Rule 803(6) of the Federal Rules of Evidence under a clearly erroneous standard. United States v. Bazemore, 41 F.3d 1431, 1433 (11th Cir. 1994) (citing United States v. Beale, 921 F.2d 1412, 1422 (11th Cir. 1991).

### i. Exclusion of lawyers' testimony:

At trial, Petrie attempted to call Michael Stewart, Esq., a civil attorney practicing in Florida, and Carol Lashley, Esq., a B&L Securities attorney from the Bahamas. Petrie sought to introduce their testimony in support of his theory that the funding contracts prepared by B&L Securities were legal and in support of his defense of good faith reliance upon the advice of counsel.[3] The record reflects Petrie's proffer

---

[3] Notwithstanding exclusion of this evidence, the district court instructed the jury on the good faith defense.

8

of the anticipated testimony of these witnesses.  With regard to Stewart, Petrie's

counsel stated:

> He is going to say that he first came with BL Syndicators, to represent BL in an interpleader action.  That he had contact with Robert Petrie, that he went to a hearing where the court was discussing a portion of the contract with regards to whether the arbitration clause was valid.
>
> He is going to say what happened with regards to the Broward County action, which all he's going to say is that the court agreed to stay it while the case got transferred over to the Bahamian courts, and that he had some conversations with Mr. Petrie who made statements that there was funding.
>
> I believe that the lawyer even knows who the funding source was.  And I'd like to ask him whether there was an allegation of fraud in the inducement in the lawsuit itself.

Transcript of Tenth Day of Jury Trial, Record Vol. 16, at 36.  With regard to Lashley,

Petrie's counsel proffered:

> I intend to call Ms. Carol Lashley.  Ms. Lashley is a lawyer in the Bahamas that once the lawsuit between BL Securities and Weddington Investments was interpled into the Broward courts, the case got abated and stayed and transferred down to the Bahamian courts.
>
> There were cross claims by each company with regard to the legality of the contract and with regards to whether there was fraud in the inducement in the contract.
>
> There was a . . . 39-page opinion that was issued going through each of the provisions of the contract. . .

9

. . .

The--the court's analysis goes through how it was--how it was indeed proper to--proper for this project to proceed. How it was with the funding, and that the funding appeared to be available, and basically that the court there went through every step of what these agreements entailed.

. . .

We believe that this is both relevant as well as maybe even a self authenticating document [referring to the Bahamian court's opinion] because we have obtained one under seal from the Court of Appeals, Commonwealth of the Bahamas. This lawyer would also testify concerning her contact with the corporation and some contact that she – she – her office had with individuals or borrowers who contacted the office asking questions about the status of BL, whether BL had ever received any type of cease or desist order, whether BL had been notified that they were the target of any type of criminal investigation . . .

. . .

As I said there that Ms. Lashley would testify concerning the background and experience of her law firm in an effort for me to show that it's not like BL is going out and hiring lawyers like Jerry Breslin.[4] They are going out and hiring top quality law firms. And this goes and spins into my good faith reliance on counsel defense, which is a recognized defense in the 11th Circuit, and the fact that the patriarch of the firm, who coincidentally is my client's father, was the attorney general of the Bahamas from 1992 to '95, along with the credentials of Mrs. Lashley who

---

[4]Jerrill Breslin was one of the creators of the funding contract utilized by B&L Securities. He testified at Petrie's trial as a cooperating witness on behalf of the government.

> obtained her degree in '78, has – was the Secretary of the Bahamas Bar Association for several years, is presently a member of the ethics committee and has been practicing basically general commercial litigation in the Bahamas courts for 21 years.

Transcript of Tenth Day of Jury Trial, Record Vol. 16, at 38-41.

The district court sustained the government's objection to the introduction of Stewart's proposed testimony on grounds of relevance and jury confusion.[5] According to the government's theory of the case, there was no contention regarding the legality of the funding contract. Rather, it was "the conduct of the parties and the representations that they made to people that created the fraud." Transcript of Tenth Day of Jury Trial, Record Vol. 16, at 34. The proffered testimony of Stewart would

---

[5]The Federal Rules of Evidence provide:

> "Relevant evidence" means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.

Fed. R. Evid. 401.

> Evidence which is not relevant is not admissible.

Fed. R. Evid. 402.

> Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

Fed. R. Evid. 403.

11

have, at best, supported Petrie's contention that the funding contracts were legal, a non-issue in the case. Therefore, we cannot say that the trial court abused its discretion by excluding that testimony as irrelevant. Assuming, *arguendo*, that the legality, *vel non*, of the funding contract had been relevant, we further conclude that the probative value of this evidence did not outweigh the potential jury confusion that would have arisen from the presentation of contract issues in the context of a criminal case. Therefore, the trial court did not err in excluding Stewart's testimony.

With regard to Lashley's testimony, Petrie argues that it would have been relevant to his defense of good faith reliance on the advice of counsel.[6] The evidentiary predicate for this defense is that the defendant "fully disclosed all material facts to his attorney" and "relied in good faith on the advice given by his attorney." United States v. Condon, 132 F.3d 653, 656 (11th Cir. 1998) (citing United States v. Johnson, 730 F.2d 683, 686 (11th Cir. 1984)). See also United States v. Eisenstein, 731 F.2d 1540, 1543 (11th Cir. 1984) ("In order to take advantage of this defense, the defendant must show that he relied in good faith after first making a full disclosure of all facts that are relevant to the advice for which he consulted the attorney.").

---

[6]Good faith constitutes a complete defense to the charge of conspiracy to launder money, because it negates the mens rea element of willfulness. See Eleventh Circuit Pattern Jury Instructions, Special Instruction No. 17, "Good Faith Reliance Upon Advice of Counsel".

12

Lashley's proffered testimony was not probative of the elements of the good faith defense.[7]  Lashley would have merely testified that she had contacts with B&L Securities in connection  with the civil suit conducted in the Bahamas.  There is no reference in the proffer of her testimony to any disclosure or reliance on the part of Petrie.  Moreover, Lashley's standing in the Bahamian legal community, or that of the defendant's father for that matter, are completely irrelevant to the good faith defense.  Therefore, we conclude that the trial court did not abuse its discretion in excluding Lashley's testimony.[8]

### ii.  Exclusion of business records:

Petrie further argues that the trial court erred by not permitting the introduction of certain business records of B&L Securities through Cheryl Ann Burrows, a secretary employed by that entity.    According to Petrie, the records he sought to introduce through Burrows demonstrated the legitimacy of B&L's dealings with its clients, and went hand in hand with the proposed testimony of Stewart and Lashley regarding his good faith defense and the Bahamian court's determination that the

---

[7]To the extent that Lashley's testimony would have covered the issue of the funding contract's legality, it was properly excluded for the same reasons that Stewart's testimony was inadmissible.

[8]Petrie assigns error to the district court's decision that, absent Petrie's taking the stand, there was no predicate in the record for admitting Lashley's testimony.  Because the proffer of the lawyer's testimony was insufficient *per se*, we need not address this contention.

13

funding contracts were legal. Rule 803(6) of the Federal Rules of Evidence provides that the following are not excluded by the hearsay rule:

> A memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record or data compilation, all as shown by the testimony of the custodian or other qualified witness. . . unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness.

Fed. R. Evid. 803(6).

In an order issued at the time of trial, the district court explained its rationale for not allowing the introduction of the records through Burrows. The court stated:

> In the instant case, Ms. Burrows is merely the secretary in Mr. Petrie's office. While she is able to testify as to how the documents are maintained, filed and retrieved, she simply is not able to testify concerning the origination and compilation of the documents. In other words . . . Ms. Burrows simply cannot testify about the initial link in the chain producing the record – that is, whether the circumstances surrounding the origination and compilation of the documents indicate reliability and trustworthiness. In this case, such testimony is particularly necessary because this case revolves around allegations of fraudulent transactions involving financial documents drafted by the very parties who created the documents the defendant now seeks to introduce through rule 803(6).

14

Order, Record Vol. 4, D.E. # 720, at 3. The trial court's factual finding of lack of trustworthiness is reversible only if clearly erroneous. <u>Bazemore</u>, 41 F.3d at 1433. Based on our review of Burrows' testimony, we conclude that the trial court was amply justified in making this finding. Because the trustworthiness prong of Rule 803(6) is not met, the trial court did not abuse its discretion in not permitting the introduction of the records.

b. <u>Expert testimony</u>:

Petrie claims that his defense was improperly curtailed by the trial court's exclusion of his proposed expert witness' testimony, which Petrie purports would have been highly relevant and extremely probative. According to Petrie, Professor James McNulty would have explained the "whole syndication world", and would have talked about "what a letter of credit is" and "why letters of credit need to be confirmed from a top 50 or a top 100 bank." Transcript of Jury Selection and Opening Statements, Record Vol. 6, at 8. Petrie contends that the trial court further compounded its error by allowing the government to introduce what he characterizes as "expert testimony" through the explanations of the funding scheme given by several cooperating co-conspirator witnesses.

The defendant waited until Friday afternoon prior to the commencement of trial on Monday, October 2, 2000 to disclose his expert to the government. This disclosure

15

was clearly untimely under Rule 16(b)(1)(C) of the Federal Rules of Criminal Procedure and Rule 26.3(C)(3) of the Local Rules for the Northern District of Florida. In this regard, it is also worth noting that almost a year and a half had passed between the return of the superseding indictment and Petrie's trial.[9]  As a sanction for this untimely disclosure, the district court did not allow Petrie's expert to testify at trial.

"Relief for violations of discovery rules lies within the discretion of the trial court; a defendant must show prejudice to his substantial rights to warrant reversal of that discretion." United States v. Accetturo, 966 F.2d 631, 636 (11th Cir. 1992) (citing United States v. Rodriguez, 799 F.2d 649, 652 (11th Cir. 1986)).  We find that the trial court properly exercised its discretion in precluding Petrie's expert from testifying at trial, based on lateness of notice to the government.  With regard to Petrie's claim of prejudice, Professor McNulty's testimony would have simply provided the jury with background information regarding financial matters. Moreover, our review of the record reveals that Petrie has mis-characterized the explanations of the funding scheme provided by the cooperating witnesses as "expert testimony."  Therefore, Petrie has not shown that the exclusion of his expert, when

_____

[9]Two prior attempts to dispose of the case had ended in mistrials.  Petrie did not utilize an expert in either of those two proceedings.

viewed *in pari materia* with the testimony of the cooperating witnesses, prejudiced his substantial rights.

c.      Invocation of fifth amendment privilege:

As additional grounds for reversal, Petrie assigns error to the trial court's decision to allow a defense witness -- a country lawyer and municipal judge from Tennessee named Donald Gamble -- to invoke his fifth amendment privilege against self-incrimination. In connection with making this ruling, the trial judge held an in camera hearing regarding Gamble's potential exposure to prosecution due to his having breached his plea agreement with the government. As previously noted, factual findings are reviewed for clear error and admissibility rulings for abuse of discretion. Bazemore, 41 F.3d at 1433; Ruiz, 253 F.3d at 639-40. Upon our review of the sealed transcript of that hearing, we find no error in the trial court's factual finding that the anticipated testimony fell within the purview of the fifth amendment privilege and no abuse of discretion in the trial court's decision to sustain the privilege.[10]

_____

[10]Petrie raises two additional issues, which do not merit much discussion. First, he complains about the admission of B&L Securities records from an overseas bank received by the government during trial. The trial court found no prejudice accruing to defendant from the admission of the bank records since they were those of the defendant's own company. Second, Petrie challenges the trial court's procedure for summoning a jury panel and for excusing jurors. The defendant argues that the procedure violated the Jury Selection and Service Act because a notice

17

3. *The appeal of Petrie's sentence:*

Finally, we turn to Petrie's appeal of his sentence. Petrie first argues that the evidence failed to establish beyond a reasonable doubt that he was responsible for the total fraud loss, citing Apprendi v. New Jersey, 530 U.S. 466 (2000). In Apprendi, the Supreme Court held that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." Apprendi, 530 U.S. at 490. The applicability of Apprendi is a question of law that we review de novo. United States v. Harris, 244 F.3d 828, 829 (11th Cir. 2001), cert. denied, 122 S. Ct. 904 (2002). Petrie's 188-month sentence is less than the 20-year statutory maximum for conspiracy to launder money. 18 U.S.C. §§ 1956(a)(1) & (h). Therefore, Apprendi is not applicable in this case. Harris, 244 F.3d at 829-30; United States v. Nealy, 232 F.3d 825, 829 n.3 (11th Cir. 2000), cert. denied, 122 S. Ct. 552 (2001).

Petrie also argues that, given his relevant conduct in the conspiracy as determined by his direct acts and the foreseeable acts of co-conspirators in which the requisite fraudulent intent was present, the ten-level enhancement based on a total loss of almost $23 million was not warranted. Petrie further argues that resentencing is

---

informing jurors of the potential length of trial and advising them how to request excusals "targeted" a less sophisticated jury pool. The defendant offers no factual basis for this argument. He merely speculates that this procedure prompted higher income earners to ask to be excused. We find no abuse of discretion on the part of the trial court as to either of these two issues.

required because the district court failed to make particularized findings concerning the scope of the conspiracy and its foreseeability to Petrie. We review the district court's determination of the facts concerning the amount of money involved in the laundering scheme under a clearly erroneous standard. United States v. Barrios, 993 F.2d 1522, 1524 (11th Cir. 1993). We have previously found that there is no clear error in cases in which the record supports the district court's findings. See, e.g., United States v. Shenberg, 89 F.3d 1461, 1478 (11th Cir. 1996). In this regard, a sentencing court's failure to make individualized findings regarding the scope of the defendant's activity is not grounds for vacating a sentence if the record support the court's determination with respect to the offense conduct, including the imputation of others' unlawful acts to the defendant. United States v. Matthews, 168 F.3d 1234, 1247 (11th Cir. 1999).

Prior to the November 1, 2001 amendment, Section 2S1.1(b)(2)(K) of the United States Sentencing Guidelines prescribed a ten level enhancement over the base offense level if the offense involved more than $20 million dollars but not more than $35 million dollars. U.S. Sentencing Guidelines Manual, supp. app. C, amend. 634.[11] In determining the amount involved, the district court must take into account "all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured,

_____

[11]Petrie was sentenced on January 8, 2001, prior to the effective date of the amendment.

or willfully caused by the defendant" and, for conspiracy offenses, "all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity". U.S. Sentencing Guidelines Manual § 1B1.3(a)(1)(A)-(B) (2001). The scope of the activity jointly undertaken by the defendants is not necessarily the same as the scope of the entire conspiracy. U.S. Sentencing Guidelines Manual § 1B1.3, cmt. n.2 (2001). Thus, to determine a defendant's accountability for the conduct of others, a district court "must first determine the scope of the criminal activity the particular defendant agreed to jointly undertake" and then consider the "conduct of others that was both in furtherance of, and reasonably foreseeable in connection with, the criminal activity jointly undertaken by the defendant." Id. In determining the scope of the criminal activity, the district court may consider "any explicit agreement or implicit agreement fairly inferred from the conduct of the defendant and others." Id.

The district court did not clearly err in calculating the amount of money laundered given Petrie's involvement in contacting clients and introducing them to the scheme to defraud them and his establishment of a company – B&L Securities -- used to defraud clients at later stages of the conspiracy. In addition, although Petrie complains that the district court failed to make specific findings in this regard, the court stated at the sentencing hearing:

20

The record in this case as substantiated by the presentence report as well as the trial testimony amply demonstrates that the twenty-two plus million is a realistic, maybe low realistic figure of the loss for which this defendant should be legally held responsible, because of his knowledge, participation, and the foreseeability by him as to how much money was potentially at risk here from these victims.

Transcript of Sentencing Hearing, Record Vol. 20, at 14-15. Hence, both the record and the sentencing court's pronouncement provide a sufficient basis to uphold the sentence imposed upon Petrie.

## CONCLUSION

For all of the foregoing reasons, Petrie's conviction and sentence are AFFIRMED. The preliminary forfeiture order is VACATED because the district court lacked jurisdiction to enter it.