[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 17-14716
_____

D.C. Docket No. 8:15-cr-00320-SDM-TGW-3


UNITED STATES OF AMERICA,

                                        Plaintiff-Appellee,

versus

PRISCILLA ANN ELLIS,
PERRY CORTESE,

                                        Defendants-Appellants.

_____

Appeals from the United States District Court
for the Middle District of Florida
_____

(June 5, 2020)

Before JORDAN, TJOFLAT, and TRAXLER,* Circuit Judges.

PER CURIAM:

---

* The Honorable William B. Traxler, Jr., Senior United States Circuit Judge for the Fourth
Circuit, sitting by designation.

Priscilla Ann Ellis and Perry Don Cortese, along with others, were charged with conspiracy to commit mail and wire fraud, *see* 18 U.S.C. § 1349, and conspiracy to launder money, *see* 18 U.S.C. § 1956(h).  A jury convicted Ellis and Cortese on both counts.  Ellis and Cortese appeal, raising challenges to their convictions and sentences.  Finding no reversible error, we affirm.

## I.  Background

Ellis is an Army veteran who lived in Harker Heights, Texas, during the relevant time period.  Cortese is an attorney who lived in Little River, Texas.  According to the evidence presented at trial, Ellis and Cortese were part of an international fraudulent scheme that began in 2012 and continued into 2015.   The government's evidence, which included testimony from cooperating members of the conspiracy and from numerous victims, showed that the conspiracy had fraudulently obtained millions of dollars from scores of victims.

The conspiracy used different scams, but the heart of the operation involved duping victims into depositing counterfeit cashier's checks in their own bank accounts and then wiring the proceeds to shell companies and overseas bank accounts controlled by the conspirators before the counterfeiting was discovered.  The conspirators used various methods to find their victims, such as emailing law firms or title companies to seek assistance in closing a real estate transaction or resolving a business dispute, sending out emails offering opportunities to work from

2

home, and using online dating services to trick women into perceived relationships and gain access to their bank accounts. Sometimes the conspirators simply hacked a victim's email account and used the victim's personal information to conduct wire transfers.

The operation was directed by Ikechukwu Amadi, a Canadian citizen and Nigerian national who used numerous aliases during the course of the conspiracy. Other members of the conspiracy included Akohomen Ighedoise, a Canadian citizen and Nigerian national; Muhammad Naji, a Jordanian national who lived in Tampa, Florida; Stacey Merritt, an Alaska resident; and Kenietta Johnson, who is Ellis's daughter and worked at a bank in Alexandria, Virginia.

Viewed in the light most favorable to the government, the evidence presented at trial showed that Ellis was deeply involved in the operation of the scheme. Amadi sent her information about counterfeit checks to be created, and Ellis worked with another co-conspirator (believed to be in South Africa) and Johnson to create and print the counterfeit checks used by the conspiracy. She brought her sister and her daughter into the scheme, recruited others to open bank accounts to be used by the conspirators, and gave instructions to other co-conspirators about where funds should be directed. Millions of dollars of fraudulent proceeds were routed through the bank account of a corporation she controlled.

Cortese's role in the conspiracies was somewhat more limited. One of his important functions was to intervene when necessary to "unfreeze" accounts that had been locked by banks because of suspicious transactions. Cortese worked closely with Ellis, and funds from many of the scams Ellis was involved in flowed through his law firm trust account. On one occasion, Ellis arranged for Cortese to fly to Utah to pick up cash from a woman who had been ensnared through one of the online-romance scams. Along with Ellis, Cortese recruited his paralegal to open bank accounts to be used by the conspiracy, and fraudulent proceeds were wired from those accounts into Cortese's law firm trust account and given to him in cash.

The operative indictment named Amadi, Ighedoise, Ellis, Cortese, Merritt, and Johnson as defendants, but the trial proceeded against only Ellis, Cortese, and Johnson.[1] Ellis represented herself at trial. Trial witnesses included Naji and Zoni Mullins, who was Cortese's paralegal, as well as numerous victims of the scams. On October 21, 2016, the jury convicted Ellis, Cortese, and Johnson of conspiracy to commit mail and wire fraud and conspiracy to launder money. (Johnson has not appealed her convictions.)

In January 2017, Ellis -- while incarcerated on the charges in this case -- conspired with others to create and pass more counterfeit checks. She needed cash

---

[1] Merritt pleaded guilty shortly before trial and testified for the government. At the time of the trial, the government was in the process of seeking extradition of Amadi and Ighedoise from Canada.

4

so she could hire a hitman to kill Naji's mother, Mullins, and Mullins's nine-year-old daughter in retaliation for their trial testimony. Based on that incident, Ellis was indicted on additional federal charges of using interstate commerce facilities in the commission of murder for hire and retaliating against a witness. Ellis was convicted of all charges arising from the murder-for-hire scheme several months before being sentenced in this case.[2]

Prior to the sentencing hearing in this case, the district court held an evidentiary hearing to determine the loss amount that would be attributed to the defendants. The court determined that Ellis and Cortese could reasonably have foreseen a total intended loss of $15,147,908.16 during the period they were involved with the conspiracy. After application of the loss-amount and other offense-level enhancements, Ellis's advisory sentencing range was 360-480 months. The district court found Ellis's conduct "incomprehensible," describing it as "evil and wicked, predatory." The court sentenced Ellis to 240 months on each count, to be served consecutively, for a total sentence of 480 months' imprisonment. Cortese's advisory sentencing range was 324-405 months. The court sentenced Cortese to a total of 300 months' imprisonment -- 240 months' imprisonment on the

---

[2] After the sentencing in this case, the district court in the murder-for-hire case sentenced Ellis to 65 years' imprisonment, with the sentence to run consecutive to the sentences in this case.

fraud conspiracy and a consecutive 60 months for the money-laundering conspiracy.

Ellis and Cortese both appeal, raising challenges to their convictions and sentences.

## II.  Trial Issues

### A.  Venue

The defendants, who lived and worked in Texas, contend that the government failed to prove that venue was proper in the Middle District of Florida.  We disagree.

The Constitution and the Federal Rules of Criminal Procedure require that criminal trials be held in the district where the crime was committed.  *See United States v. Cabrales*, 524 U.S. 1, 6 (1998).  "[T]he site of a charged offense must be determined from the nature of the crime alleged and the location of the act or acts constituting it." *Id.* at 5 (internal quotation marks omitted).  "[I]n an action involving a conspiracy, . . .  the offense has been committed in any district where any overt act was performed in furtherance of the conspiracy." *United States v. Bradley*, 644 F.3d 1213, 1253 (11th Cir. 2011).

In this case, venue in the Middle District of Florida was predicated on the actions of co-conspirator Naji, who cooperated with the government and testified at trial.  Naji lived in Tampa, which is in the Middle District.  Naji testified that he opened a bank account (in the name of a shell company) in Tampa and that the account was used to funnel the proceeds of various scams to accounts controlled by the co-conspirators.  While living in Tampa, Naji recruited his girlfriend and others,

6

including prostitutes, to open accounts that were used by the conspiracy to launder fraudulent proceeds. Naji's testimony thus established that multiple overt acts in furtherance of the conspiracy took place within the Middle District of Florida.

The defendants insist, however, that venue cannot be established through Naji, because he cooperated with the government and therefore was no longer a member of the conspiracy. *See United States v. Wright*, 63 F.3d 1067, 1072 (11th Cir. 1995) ("[I]t takes at least two to conspire neither of which may be government agents or informers."). This argument is without merit. Although Naji eventually began cooperating with the government, the evidence presented at trial showed numerous overt acts that happened in Tampa *before* Naji began cooperating. *See United States v. Breitweiser*, 357 F.3d 1249, 1253 (11th Cir. 2004) (explaining that when considering a challenge to venue, this court must "view[] the evidence in the light most favorable to the government and mak[e] all reasonable inferences and credibility choices in favor of the jury verdict") (internal quotation marks omitted). That evidence was more than sufficient to establish that venue was proper, whether or not Ellis or Cortese had any personal connection with the Middle District of Florida. *See United States v. Matthews*, 168 F.3d 1234, 1246 (11th Cir. 1999) ("Where a conspiracy is concerned, venue is . . . proper in any district where an overt act was committed in furtherance of the conspiracy. The overt act need not be committed by a defendant in the case; the acts of accomplices and unindicted co-

conspirators can also expose the defendant to jurisdiction.") (citation and internal quotation marks omitted).

## B.  Sufficiency of the Evidence

The defendants contend that the government's evidence was insufficient to support their conspiracy convictions.  We review the sufficiency of the evidence *de novo*.  *See United States v. Hasson*, 333 F.3d 1264, 1270 (11th Cir. 2003).  "The record is viewed in the light most favorable to the verdict, drawing all reasonable inferences and resolving all questions of credibility in favor of the government.  Viewed in such a light, the verdict will be affirmed if a reasonable juror could conclude that the evidence establishes guilt beyond a reasonable doubt."  *Id.*

### 1.  Conspiracy to Commit Mail and Wire Fraud

To convict a defendant of conspiracy to commit mail or wire fraud, the government must prove "(1) a conspiracy to commit [mail or wire fraud]; (2) knowledge of the conspiracy; and (3) that [the defendant] knowingly and voluntarily joined the conspiracy."  *United States v. Feldman*, 931 F.3d 1245, 1257 (11th Cir. 2019) (internal quotation marks omitted), *cert. denied*, 2020 WL 1668565 (U.S. Apr. 6, 2020).

### a.  Ellis

Ellis does not challenge the sufficiency of the evidence showing the existence of the conspiracy.  Instead, Ellis argues that she was duped by other members of the

conspiracy and was an unwitting participant in the fraudulent schemes. Ellis contends that while she "may have *incidentally* participated in the schemes to defraud, no competent evidence existed to suggest that she *intentionally* participated in the frauds." Initial Brief of Ellis at 29-30. We disagree.

The government presented overwhelming evidence in the form of testimony, emails, and text messages showing Ellis's direct and substantial involvement in the conspiracy. She was in constant contact with Amadi through email, text, and phone calls. She was directly involved in the creation and deployment of the counterfeit cashier's checks and used her daughter to print the checks. Ellis and Cortese recruited Mullins to open new bank accounts to be used to receive and distribute proceeds from the conspiracy's schemes. Mullins opened the accounts, received wire transfers directed into the accounts by Ellis, and transferred the funds out of the account as instructed by Cortese and by Ellis. Mullins removed cash from the accounts and distributed it at the defendants' direction. On one occasion, Mullins followed instructions and withdrew cash, which she gave directly to Cortese and Ellis who were waiting at nearby Sam's Club. Millions of dollars of fraud proceeds flowed through the bank account of Vicken International Traders, a company Ellis controlled that conducted no apparent legitimate business. When she was arrested, Ellis told the agents that Vicken's bank account had been frozen four times because of suspicious activities.

The evidence described above does not paint the picture of a mere victim who unwittingly opened her bank accounts to fraudsters. Instead, the evidence was more than sufficient to permit a reasonable juror to conclude beyond a reasonable doubt that Ellis was a knowing, active participant in the conspiracy.

### b. Cortese

Cortese also contends that the evidence was insufficient to show that he knowingly joined the conspiracy. He contends he served as Ellis's lawyer but had no knowledge that she was involved in fraudulent schemes.

Although Cortese's involvement in the conspiracy was not as extensive as Ellis's, the evidence nonetheless showed that it was significant. If a bank froze an account being used by a co-conspirator, Amadi connected the co-conspirator to Cortese for help in regaining access to the account. For example, when one of Naji's recruits (his girlfriend) had an account frozen, Naji initiated a conference call between his girlfriend, Amadi, Ellis, and Cortese to discuss the account, and Cortese touted his success in unfreezing accounts. And when Naji was arrested in 2015 on the charges in this case, Amadi directed Cortese to call Naji. When they talked, Cortese wanted information so Amadi could access an account controlled by Naji, because a $1.5 million transfer has just been made to that account. And, as discussed above, proceeds from various scams involving counterfeit checks created at Ellis's direction were transferred into Cortese's trust account; Cortese was directly involved

10

(along with Ellis) in bringing Mullins, his paralegal, into the scheme and directing the use of the accounts she opened; and Cortese, at Ellis's direction, flew to Utah to collect cash from a victim.

Cortese may not have known all of the members of the conspiracy, and he may not have profited from the conspiracy as much as other members, but those points are largely irrelevant to our inquiry on appeal. *See, e.g., United States v. Perez-Tosta*, 36 F.3d 1552, 1557 (11th Cir. 1994) ("Guilt [on a conspiracy charge] may exist even when the defendant plays only a minor role and does not know all the details of the conspiracy."). In our view, the evidence recounted above was plainly sufficient to support the jury's verdict. *See United States v. Knowles*, 66 F.3d 1146, 1154 (11th Cir. 1995) ("For sufficiency purposes, the evidence need not exclude every reasonable hypothesis of innocence; rather, the question is whether a reasonable trier of fact, when choosing among reasonable constructions of the evidence, could have found the defendant guilty beyond a reasonable doubt.") (footnotes and internal quotation marks omitted); *Perez-Tosta*, 36 F.3d at 1557 ("Participation in a criminal conspiracy need not be proved by direct evidence; a common purpose and plan may be inferred from a development and collocation of circumstances.") (internal quotation marks omitted).

2. Conspiracy to Commit Money Laundering

11

To convict Ellis and Cortese under 18 U.S.C. § 1956(h), "the Government needed to prove two elements . . . : (1) an agreement between two or more persons to commit a money-laundering offense; and (2) knowing and voluntary participation in that agreement by the defendant." *United States v. Feldman*, 936 F.3d 1288, 1307 (11th Cir. 2019) (internal quotation marks omitted).   "An essential element of money laundering conspiracy is that the defendant knew that the funds involved in the transactions represented the proceeds of unlawful activity."   *Id.* (internal quotation marks omitted).   In this case, the government alleged two money-laundering offenses as the objects of the conspiracy:  money laundering to promote the carrying-on of the conspiracy, *see* 18 U.S.C. § 1956(a)(1)(A)(i), and money-laundering to conceal the source of the funds, *see id.* § 1956(a)(1)(B)(i).

The defendants do not argue that the evidence was insufficient to establish the existence of a money-laundering conspiracy, but again argue that they did not knowingly participate in the conspiracy.  We disagree.

As discussed above, the government's evidence showed that Ellis was involved in the creation of the counterfeit checks and in directing the accounts through which the fraudulent proceeds would flow.  She recruited Mullins to open accounts and instructed her to open them as business accounts, which would draw less scrutiny from the banks.  Ellis provided other co-conspirators with documents (created by Amadi) purporting to show a legitimate purpose for the wire transfers

into Mullins's account. Ellis knew that bank accounts used by the conspiracy were being closed for fraud, and she worked with Cortese to try to regain access to these accounts. We have no difficulty finding this evidence sufficient to show Ellis's knowledge of the fraudulent origins of the funds and her knowing participation in the money-laundering conspiracy.

The evidence was likewise sufficient to support Cortese's conviction. Like Ellis, Cortese knew that banks were recalling wire transfers and rejecting counterfeit checks, and he intervened to try to unfreeze accounts being used by the conspiracy. Amadi connected Cortese with other conspirators when bank accounts were frozen for fraudulent activity. Cortese received fraudulent proceeds into his trust account, and he transferred the funds out as directed, sometimes to overseas accounts. Cortese worked with Ellis to bring Mullins into the scheme and pushed her to open more accounts than she was willing to do. He informed Mullins when wire transfers would appear in her accounts, and he gave her instructions on how the funds should be transferred out of the account. Cortese also advised Mullins on how to interact with the banks so as not to raise questions. From this evidence, a reasonable juror could easily conclude that Cortese knew that the funds were the proceeds of fraudulent activity and that he knowingly participated in the money-laundering conspiracy.

## III. Sentencing Issues

13

A.  Loss Amount

For fraud-based offenses, the Sentencing Guidelines provide for an increase in the offense level based on the amount of loss that resulted from the fraud.  *See* U.S.S.G. § 2B1.1(b)(1).  After conducting an evidentiary hearing, the district court determined that the intended loss of the conspiracy was $15,147,908.16, and that the full amount was reasonably foreseeable to both Ellis and Cortese.  The loss amount included $9,288,241.36 of fraudulently obtained funds that were actually wire-transferred  into accounts used by the conspiracy, and $5,859,666.80 in counterfeit checks that were received by victims but not cashed.  The loss amount as calculated by the district court increased the defendants' offense level by 20 levels.  *See* U.S.S.G. § 2B1.1(b)(1)(K).

On appeal, Ellis and Cortese both challenge the district court's loss calculation and contend that they should not be held responsible for the full $15 million in intended loss found by the district court.  "We review a loss-amount determination for clear error and must affirm the finding by the district court if it is plausible in light of the record viewed in its entirety."  *United States v. Whitman*, 887 F.3d 1240, 1248 (11th Cir. 2018) (internal quotation marks omitted), *cert. denied*, 139 S. Ct. 1276 (2019).

The Sentencing Guidelines direct the sentencing court when calculating the loss amount to consider "all acts and omissions committed, aided, abetted,

14

counseled, commanded, induced, procured, or willfully caused by the defendant." U.S.S.G. § 1B1.3(a)(1)(A).  For conspiracy offenses, the court must also take into account  "all acts and omissions of others that were . . . (i) within the scope of the jointly undertaken criminal activity, (ii) in furtherance of that criminal activity, and (iii) reasonably foreseeable in connection with that criminal activity" and occurred in the commission of or preparation for the offense or to avoid detection of or responsibility for the offense.  *Id.* § 1B1.3(a)(1)(B).  Because "[t]he scope of the activity jointly undertaken by the defendants is not necessarily the same as the scope of the entire conspiracy," *United States v. Petrie*, 302 F.3d 1280, 1290 (11th Cir. 2002), the sentencing court "must first determine the scope of the criminal activity the particular defendant agreed to jointly undertake and then consider the conduct of others that was both in furtherance of, and reasonably foreseeable in connection with, the criminal activity jointly undertaken by the defendant." *Id.* (internal quotation marks omitted).

In our view, the district court's loss determination is firmly supported by the evidence presented at trial and at the evidentiary hearing.  *See United States v. Baldwin*, 774 F.3d 711, 727 (11th Cir. 2014) ("The district court may make factual findings regarding loss based on trial evidence, undisputed statements in the Presentence Investigation Report . . . , or evidence presented at the sentencing hearing.").

15

The district court adopted the government's proposed loss amount, and that amount was a conservative estimate of the total intended losses. Although the government believed that Ellis joined the conspiracy sometime in 2011 or 2012, the government's calculation included only losses occurring after October 2013, the point by which Cortese and Johnson both had joined the conspiracy.

Moreover, the losses included in the calculations were not the losses of the entire conspiracy during that time frame, but only those that could be connected in some manner to the defendants. For example, Ellis was involved in the creation of every counterfeit check, and $2,600,000 in fraudulent proceeds flowed through her Vicken Traders account. Ellis and Cortese were connected to the accounts controlled by co-conspirator Naji through the evidence of their Amadi-directed attempts to unfreeze the account opened by Naji's girlfriend and Cortese's efforts to get account information from Naji after Naji was arrested. Cortese was connected to the $580,000 loss caused by a romance scheme when he traveled – at Ellis's direction – to Utah to retrieve from the victim the money returned to her by the bank after it closed the account. Ellis gave instructions on transferring out proceeds to other co-conspirators, and accounts controlled by Cortese and Ellis received wire transfers from accounts controlled by other co-conspirators.

Given the level of the defendants' involvement in the conspiracy and the connections between the defendants and the loss amount asserted by the government,

16

the district court did not err in concluding that Ellis and Cortese each could reasonably foresee that their jointly undertaken criminal activity would involve the full intended loss amount of $15,147,908.16. *See Whitman*, 887 F.3d at 1248 (explaining that a defendant's "mere awareness that he was part of a larger scheme is alone insufficient . . . , [b]ut actions that suggest that the defendant was actively involved in a criminal scheme permit the inference that the defendant agreed to jointly undertake that scheme) (internal quotation marks omitted).[3]

## B.  Other Offense-Level Enhancements

### 1.  Ellis

Ellis challenges the district court's application of a two-level enhancement under U.S.S.G. § 2B1.1(b)(10) for using sophisticated means in the fraud offenses while also applying a two-level enhancement for engaging in sophisticated money laundering under U.S.S.G. § 2S1.1(b)(3).  She contends that application of both enhancements was impermissible double-counting, and she also argues that the sophisticated money-laundering enhancement is not factually supported.  We find no error.

---

[3] The defendants contend that the district court failed to make sufficiently specific findings about the scope of conduct agreed to by the defendants.  Even assuming the court's findings were not sufficient, reversal is not required because the record amply supports the district court's findings.  *See Petrie*, 302 F.3d at 1290 ("[A] sentencing court's failure to make individualized findings regarding the scope of the defendant's activity is not grounds for vacating a sentence if the record support the court's determination with respect to the offense conduct, including the imputation of others' unlawful acts to the defendant.").

17

"Impermissible double counting occurs only when one part of the Guidelines is applied to increase a defendant's punishment on account of a kind of harm that has already been fully accounted for by application of another part of the Guidelines." *United States v. Matos-Rodriguez*, 188 F.3d 1300, 1309 (11th Cir. 1999) (internal quotation marks omitted). As Ellis recognizes, the district court applied the § 2B1.1(b)(10) enhancement because of the use of sophisticated means in the commission of the fraud, *see* U.S.S.G. § 2B1.1(b)(10)(C), but also because "a substantial part of a fraudulent scheme was committed from outside the United States," *id.* § 2B1.1(b)(10)(B). The enhancement under § 2B1.1 thus addresses the harm caused by international fraud schemes, while the enhancement under § 2S1.1 addresses the very different harm caused by sophisticated money laundering schemes. *See* U.S.S.G. § 2S1.1(b)(3) (enhancement applies if the defendant was convicted under 18 U.S.C. § 1956 and "the offense involved sophisticated laundering"); *id.* cmt. n.5(A) ("'[S]ophisticated laundering' means complex or intricate offense conduct pertaining to the execution or concealment of the 18 U.S.C. § 1956 offense."). And because the enhancements are premised on different conduct, the Guidelines do not prohibit application of both. *See* U.S.S.G. § 2S1.1 cmt. n.5(B) (stating that the sophisticated laundering enhancement should not be applied if "the conduct that forms the basis for an enhancement under the guideline applicable to the underlying offense is *the only conduct* that forms the basis for

18

application of subsection (b)(3) of this guideline") (emphasis added). The district court therefore did not err by applying the § 2B1.1 and 2S1.1 enhancements. *See United States v. Stevenson*, 68 F.3d 1292, 1294 (11th Cir. 1995) (per curiam) ("We presume that the Commission intended to apply separate guideline sections cumulatively unless specifically directed otherwise.").

As to Ellis's argument that the sophisticated laundering enhancement was not factually warranted, we note that the evidence before the district court showed that the defendants laundered their funds using fictitious transactions, shell corporations, and offshore accounts. The district court therefore did not err in applying the enhancement. *See* U.S.S.G. § 2S1.1 cmt. n.5(A) ("Sophisticated laundering typically involves the use of (i) fictitious entities; (ii) shell corporations; (iii) two or more levels (i.e., layering) of transactions, transportation, transfers, or transmissions, involving criminally derived funds that were intended to appear legitimate; or (iv) offshore financial accounts.").

Ellis also contends the district court erred by concluding that she qualified as a manager or supervisor and applying a three-level enhancement under U.S.S.G. § 3B1.1. We disagree.

The enhancement applies "[i]f the defendant was a manager or supervisor (but not an organizer or leader) and the criminal activity involved five or more participants or was otherwise extensive." U.S.S.G. § 3B1.1(b). For the

enhancement to apply, "the defendant need only manage or supervise one other participant in the criminal activity. However, a section 3B1.1 enhancement cannot be based solely on a finding that a defendant managed the assets of a conspiracy, without the defendant also managing or exercising control over another participant." *United States v. Sosa*, 777 F.3d 1279, 1301 (11th Cir. 2015) (citation and internal quotation marks omitted). The evidence in this case established that Ellis supervised the creation of the counterfeit checks and gave direction to multiple conspirators and participants, including Cortese, Johnson, and Mullins. The district court therefore did not err in applying the enhancement. *See id.* at 1300 ("We review for clear error . . . a district court's decision to impose an aggravating-role increase . . . . Under the deferential standard of clear-error review, we will not disturb a district court' findings unless we are left with a definite and firm conviction that a mistake has been committed.") (citations and internal quotation marks omitted).

## 2. Cortese

Cortese contends that the district court erred by concluding that Cortese used a special skill and applying a two-level enhancement under U.S.S.G. § 3B1.3. We find no error.

The enhancement applies "[i]f the defendant abused a position of public or private trust, or used a special skill, in a manner that significantly facilitated the commission or concealment of the offense." U.S.S.G. § 3B1.3. "'Special skill'

20

refers to a skill not possessed by members of the general public and usually requiring substantial education, training or licensing. Examples would include pilots, lawyers, doctors, accountants, chemists, and demolition experts." *Id.* cmt. n.4.

The record before the district court was sufficient to support the conclusion that Cortese acted as an attorney when advising victims whose accounts had been frozen and when negotiating with the banks to reopen the accounts. His status as an attorney and his assurances helped lull the victims into believing that nothing was amiss, which helped conceal the fraud for as long as possible. Under these circumstances, we cannot say the district court clearly erred in finding that Cortese used his skills as an attorney when committing the offenses. *See United States v. De La Cruz Suarez*, 601 F.3d 1202, 1219 (11th Cir. 2010) ("The district court's legal interpretation of the term 'special skills' is reviewed *de novo*, but whether the defendant possesses a special skill under § 3B1.3 of the Sentencing Guidelines is a factual finding reviewed for clear error.").

## C.  Reasonableness of Sentence

Finally, Ellis and Cortese both challenge the reasonableness of their sentences. We review the reasonableness of a sentence for an abuse of discretion. *Gall v. United States*, 552 U.S. 38, 51 (2007); *United States v. Irey*, 612 F.3d 1160, 1188 (11th Cir. 2010) (en banc). A district court abuses its discretion if it fails to consider "relevant factors that were due significant weight"; if it "gives significant

21

weight to an improper or irrelevant factor"; or if it otherwise "commits a clear error of judgment in considering the proper factors." *Irey*, 612 F.3d at 1189 (internal quotation marks omitted).

### 1.  Ellis

Ellis contends that the district court failed to properly consider the 18 U.S.C. § 3553(a) factors.  She argues that the facts do not support the court's view of the nature of the offense, that the court gave too much weight to her lack of remorse and her actions in the murder-for-hire case, and that the court ignored all mitigating factors.

We find no procedural or substantive error in the court's sentence.  The record reveals that the district court properly considered the § 3553(a) factors and their relevance to the sentencing decision.  The court considered the scope of the conspiracy and the damage caused to its victims, as well as Ellis's lack of remorse for her conduct and its effect on the victims.  *See* 18 U.S.C. § 3553(a)(1) (requiring sentencing court to consider "the nature and circumstances of the offense and the history and characteristics of the defendant"); *id.* § 3553(a)(2)(A) (sentence imposed should "reflect the seriousness of the offense, . . . promote respect for the law, and . . . provide just punishment for the offense"). And, contrary to Ellis's argument, the court also properly considered Ellis's actions in the murder-for-hire scheme, as the charges in that case involved retaliation against witnesses in this case and were

22

relevant to Ellis's personal characteristics, the need for deterrence, and the need to protect the public from future crimes. *See* 18 U.S.C. §§ 3553(a)(1); (2)(B)-(C). While Ellis disagrees with the weight the district court placed on the deterrence factor, a sentencing court is permitted to weigh one factor more heavily than others. *See United States v. Shaw*, 560 F.3d 1230, 1237 (11th Cir. 2009) ("The district court must evaluate all of the § 3553(a) factors when arriving at a sentence, but is permitted to attach great weight to one factor over others.") (citation and internal quotation marks omitted). The court did not explicitly address any mitigating factors, but those factors were spelled out in the presentence investigation report, which the district court adopted and showed its familiarity with during the sentencing hearing. Accordingly, the record reveals that the district court properly considered the relevant facts within the framework of § 3553(a).

Although the 40-year sentence imposed in this case is severe, we cannot say that the sentence is "outside the range of reasonable sentences dictated by the facts of the case." *United States v. Goldman*, 953 F.3d 1213, 1222 (11th Cir. 2020). The sentence falls within the Guidelines advisory range, and it accomplishes the district court's goal of protecting society from an unrepentant criminal who had inflicted financial ruin on numerous victims and was willing to use violence against those who exposed her crimes. *See United States v. Rosales-Bruno*, 789 F.3d 1249, 1254 (11th Cir. 2015) ("The decision about how much weight to assign a particular

23

sentencing factor is committed to the sound discretion of the district court.") (internal quotation marks omitted); *Irey*, 612 F.3d at 1189–90 ("In reviewing the reasonableness of a sentence, we must, as the Supreme Court has instructed us, consider the totality of the facts and circumstances."). Accordingly, we reject Ellis's claim that the district court imposed an unreasonable sentence. *See Irey*, 612 F.3d at 1191 ("We may set aside a sentence only if we determine, after giving a full measure of deference to the sentencing judge, that the sentence imposed truly is unreasonable.").

## 2. Cortese

Cortese contends that his 300-month sentence is substantively unreasonable. He argues that a significantly shorter sentence is warranted because his role in the conspiracy was limited and his financial gain was minimal.

We disagree. Although Cortese's involvement in the conspiracy was not as extensive as Ellis's, it was still extensive. As previously outlined, Cortese intervened as necessary to try to convince banks to unfreeze accounts being used to funnel conspiracy proceeds and to soothe the fears of the victims whose accounts had been frozen. He personally recruited Mullins to open more accounts to be used for the benefit of the conspiracy and gave her instructions on how to disburse the fraudulent proceeds that appeared in her account. Regardless of the extent of his personal financial gain, Cortese knowingly and directly participated in a long-

24

running conspiracy that stole millions of dollars from its victims. The district court had before it all of the mitigation evidence, and weighed that evidence against the facts of the crime and the other § 3553 factors to arrive at a below-Guideline sentence of 300 months. Given the record before us, we see no clear error of judgment by the district court in sentencing Cortese. *See United States v. Langston*, 590 F.3d 1226, 1237 (11th Cir. 2009) ("We do not reweigh relevant factors nor do we remand for re-sentencing unless the district court committed a clear error of judgment in weighing the § 3553(a) factors by arriving at a sentence outside the range of reasonable sentences.").

Cortese also complains about the extent to which a sentence for fraud is driven by the loss-amount determination. Cortese contends that the amount of intended loss is not a good proxy for a defendant's culpability, and he argues that application of the steep loss-amount enhancements under the Guidelines leads to irrational sentences. Whatever the merits of this argument, it is a policy argument that provides no basis for reversal of the sentence imposed in this case. The district court considered the facts and the statutory sentencing factors and arrived at a sentence that we have found to be reasonable. That the application of the loss-amount enhancement might lead to an unreasonable sentence in another case does not affect the reasonableness of the sentence imposed in this case.

25

Finally, Cortese argues that the abuse-of-discretion standard we apply to sentencing appeals is unconstitutional. Noting that appellate courts may presume the reasonableness of a within-Guidelines sentence, *see Rita v. United States*, 551 U.S. 338, 341 (2007), Cortese contends that the abuse-of-discretion standard has been applied in a way to effectively prevent criminal defendants from ever successfully rebutting the presumption. In Cortese's view, the abuse-of-discretion standard "gives too much deference and is too forgiving," such that "[d]istrict courts are effectively immune from appellate review." Initial Brief of Cortese at 48.

This argument is without merit. The Supreme Court has directed that the abuse-of-discretion standard governs the reasonableness review of sentences imposed under advisory Guidelines. *See Gall*, 552 U.S. at 51 ("Regardless of whether the sentence imposed is inside or outside the Guidelines range, the appellate court must review the sentence under an abuse-of-discretion standard."). The case law from this circuit is consistent with that directive. *See, e.g.*, *United States v. Gomez*, 955 F.3d 1250, 1255 (11th Cir. 2020) ("We review the reasonableness of the district court's sentences for an abuse of discretion, employing a two-step process."). If Cortese believes we have misapplied that standard when reviewing his sentence, he may raise that issue in a petition for review with the Supreme Court, and he may urge that Court to consider fashioning a new standard. But this panel may not abandon the abuse-of-discretion standard merely because Cortese disagrees

26

with the standard and believes it has been misapplied in other cases. *See United States v. Vega-Castillo*, 540 F.3d 1235, 1236 (11th Cir. 2008) (per curiam) ("Under the prior precedent rule, we are bound to follow a prior binding precedent unless and until it is overruled by this court en banc or by the Supreme Court.") (internal quotation marks omitted).

## IV.  Conclusion

To summarize, we conclude that venue was proper in the Middle District of Florida because co-conspirator Naji committed acts in furtherance of the conspiracy within the Middle District and that the evidence was sufficient to support Ellis's and Cortese's convictions for conspiracy to commit mail and wire fraud and conspiracy to commit money laundering.   We find no error in the district court's calculation of the intended loss amount  attributable to the defendants or the court's application of the other challenged offense-level enhancements, and we reject the defendants' claims that their sentences are substantively unreasonable.  Accordingly, we hereby affirm the convictions and sentences of Ellis and Cortese.

**AFFIRMED.**